Thomas A. CARY and Beth Hanna, individually and on behalf of his minor daughter, Dena Cary, Petitioners,

v.

UNITED OF OMAHA LIFE INSURANCE COMPANY and Mutual of Omaha of Colorado, Inc., d/b/a Antero Health Plans, Respondents.

Nos. 01SC708, 01SC834.

Supreme Court of Colorado,
En Banc.

April 21, 2003.

As Modified on Denial of Rehearing
May 19, 2003.

Wilcox & Ogden, P.C., Ralph Ogden, Denver, Colorado, Attorneys for Petitioners.

Kutak Rock LLP, Gerard V. Reardon, Melvin B. Sabey, Denver, Colorado, Attorneys for Respondent United of Omaha Life Insurance Company.

Kennedy & Christopher P.C., John R. Mann, Christopher K. Miller, Denver, Colorado, Attorneys for Respondent Mutual of Omaha of Colorado, Inc., d/b/a Antero Health Plans.

Justice HOBBS delivered the Opinion of the Court.

We granted certiorari in this case [1] to review the court of appeals' decision in *Cary v. United of Omaha Life Ins. Co.*, 43 P.3d 655 (Colo.App.2001).[2] The court of appeals upheld the trial court's ruling on summary judgment. The court of appeals held that third-party insurance administrators hired by a city to run its health insurance program did not owe a duty of good faith and fair dealing to a claimant in the investigation and processing of an insurance claim, because there was no contractual relationship between the administrators and the insurance claimant. *Id.* at 658.

We disagree with the court of appeals' strict application of a privity of contract analysis to this case. Here, the insurance administrators had primary control over benefit determinations, assumed some of the insurance risk of loss, undertook many of the obligations and risks of an insurer, and had the power, motive, and opportunity to act unscrupulously in the investigation and servicing of the insurance claims. Under such circumstances, we hold that a special relationship existed between the administrators and the insured sufficient to establish in the administrator a duty to act in good faith. In order for Cary to recover for a breach of that

---

1. We granted certiorari on the following issues:
   1) Whether third-party administrators of health insurance plans owe the insureds any duty to process claims and determine coverage in a reasonable or good faith manner, and hence, whether they can be liable for either bad faith or negligence in the handling of those claims.
   2) Whether the court of appeals' decision to affirm the district court's award of costs must

be reversed because the respondents are not the prevailing parties in this case.
   In light of our holding, we vacate the award of costs to the Administrators.

2. We consolidated this case with an appeal from an unpublished court of appeals opinion in case number 00CA2127. The two appeals involve the same parties and the same underlying case.

duty in tort on remand of this case, he must establish the facts and prove his case that the administrators' conduct was unreasonable and the administrators knew either that their conduct was unreasonable or acted in reckless disregard of whether their conduct was unreasonable.

Accordingly, we reverse the judgment of the court of appeals and reinstate claimant's tort cause of action against the administrators for breach of their duty to act in good faith when investigating and servicing the insurance claims.

We turn first to the evidence the parties put forth, as of the time the trial court entered summary judgment against Cary. For the purpose of reviewing the propriety of the court's summary judgment order, we must resolve all doubts in favor of Cary, the non–moving party. *See Smith v. Boyett,* 908 P.2d 508, 514 (Colo.1995). In addition, Cary is entitled to all favorable inferences that may be drawn from the facts. *Id.*

## I.

The City of Arvada offered its employees, like Thomas Cary, access to its self-funded health insurance program overseen by the Arvada Medical and Disability Program Trust Fund (Trust), but administered by United of Omaha and Mutual of Omaha of Colorado[3] (Administrators).

Due to its limited resources, the Trust did not administer the Plan itself. A five-member volunteer board of trustees staffed the trust. It had no support staff, and none of its members had any experience or expertise in handling insurance claims or making coverage decisions. The board therefore did not investigate claims or involve itself in claims handling or processing (other than hearing final appeals). It met only quarterly to consider claims appeals, review contracts with third-party administrators such as United and Omaha, approve contracts for the provision of certain mental health services, and consider funding issues.

By contrast, United, whom the Trust hired to administer the Plan, exercised near-complete control over the administration of the Plan. United's contract with the Trust obligated it to: provide claim handling facilities; furnish claim handling personnel; establish claim handling procedures, including claim files and systems; verify claimant eligibility for the Plan; receive all claim forms and related materials from Plan members; process submitted claims; send "explanation of benefits" letters to claimants when it acts on a claim; prepare claim payments; provide actuarial services to the Trust to project estimated Plan benefit costs; provide underwriting services whereby it analyzes Plan benefits and makes recommendations to the Trust about modifying the benefits; print and pay the cost of all Plan claim forms and benefit checks; develop and print Plan benefit booklets and identification cards; evaluate the health histories of "late" applicants and determine whether they should have Plan coverage; provide a toll-free number for Plan claimants; and periodically audit the claims processing system to determine the quality of claim administration. United even established an appellate procedure for denials of coverage (though the Trust was the entity of last resort for appeals).[4]

At the same time United agreed to administer the Plan, it entered into a reinsurance agreement with the Trust. Pursuant to this agreement, United agreed to reimburse the Trust for payments in excess of $75,000, but less than $1 million, for any one Arvada employee. It also agreed to reimburse the Trust for aggregate claims in excess of a certain dollar amount.

The claims dispute in this case began when Thomas Cary and Beth Hanna's (Cary's) fifteen-year-old daughter, a beneficiary of the Plan, shot herself in an unsuccessful suicide attempt. Her injuries required extensive treatment, hospitalization, and multiple surgeries. Cary applied for benefits from the Plan but the Administrators denied his claim, citing the Plan's exclusion of self-inflicted injuries as justification.

Cary responded to the denial by suing the City, the Trust, and the Administrators, seeking a declaration that the Plan covered his daughter's injuries, as well as damages

---

**3.** Mutual of Omaha of Colorado does business as Antero Health Plans. It is a wholly owned subsidiary of respondent United of Omaha Life Insurance Company.

**4.** Apparently United assigned some of these functions, including the appellate function, to its wholly owned subsidiary, respondent Mutual of Omaha of Colorado.

for breach of his insurance contract and bad faith failure to provide insurance benefits. The trial court granted partial summary judgment for Cary, finding that the self-inflicted injury exclusion of the contract is ambiguous and resolving the ambiguity in favor of coverage.[5] However, the trial court on summary judgment also dismissed Cary's claims against the Administrators for bad faith failure to provide insurance benefits, because Cary was not in contractual privity with the Administrators and no statute or regulation imposed an obligation to act in good faith on the Administrators in favor of Cary or his daughter.

Following the trial court's rulings, Cary settled with the City and the Trust for $800,000, and neither of those entities is involved with this appeal. Cary appealed the dismissal of his bad faith claim. The court of appeals affirmed the district court's judgment, holding that City's independent claims administrators owe no duty of good faith and fair dealing to parties, like Cary, who are not in contractual privity with the claims administrators.

## II.

■ We disagree with the court of appeals' strict application of a privity of contract analysis to this case. Here, the insurance administrators had primary control over benefit determinations, assumed some of the insurance risk of loss, undertook many of the obligations and risks of an insurer, and had the power, motive, and opportunity to act unscrupulously in the investigation and servicing of the insurance claims. Under such circumstances, we hold that a special relationship existed between the Administrators and the insured sufficient to establish in the Administrators a duty to act in good faith. In order for Cary to recover for a breach of that duty in tort on remand of this case, he must establish the facts and prove that the Administrators' conduct was unreasonable and the Administrators either knew their conduct was unreasonable or acted in reck-

less disregard of whether their conduct was unreasonable.

## A.

### Standard of Review

The trial court and court of appeals held that a third-party insurance claims administrator does not have a duty of good faith and fair dealing in the investigation and processing of the insured's claim, unless there is a contractual relationship between the insured and the administrator.

■ The existence and scope of a tort duty is a matter of law. E.g. HealthONE v. Rodriguez, 50 P.3d 879, 888 (Colo.2002). Whether defendant owes a duty to plaintiff under tort law involves a number of factors.[6] No single factor controls; "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable people would recognize a duty and agree that it exists." Id. (quoting Greenberg v. Perkins, 845 P.2d 530, 536 (Colo.1993)). The determination that a duty does or does not exist is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is [or is not] entitled to protection." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53, at 359 (5th ed.1984). We review, de novo, lower court determinations that a duty does or does not exist. E.g. Ryder v. Mitchell, 54 P.3d 885, 889 (Colo.2002)(reviewing, de novo, the question of whether the defendant owes a duty to the plaintiff).

■ The trial court granted summary judgment against Cary. But, summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. HealthONE, 50 P.3d at 887. The non-moving party is entitled to the bene-

---

**5.** Although the Plan expressly excluded coverage for self-inflicted injuries, the district court found the scope of coverage under the Plan to be ambiguous, largely because the Plan defined the term "injury" in terms of accidental injuries, independent of illness and because the 1994 summary of the Plan sent to policyholders did not include self-inflicted injuries among the enumerated exclusions. The district court's order granting Cary's motion for summary judgment

with regard to coverage of his daughter's medical treatment is not before us in this appeal.

**6.** For instance, courts consider (1) the risk involved, (2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, (3) the magnitude of the burden of guarding against injury or harm, and (4) the consequences of placing the burden on the actor. E.g. HealthONE, 50 P.3d at 888.

fit of all favorable inferences that may be reasonably drawn from the undisputed facts, and all doubts must be resolved against the moving party. *Id.* A court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in determining whether to grant a motion for summary judgment. *Id.* (quoting C.R.C.P. 56(c)).

Summary judgment is a drastic remedy, to be granted only when there is a clear showing that the applicable standards have been met. *Id.* at 887–88. We review a grant of summary judgment de novo. *Id.* at 888. Here, Cary was entitled to proceed on his bad faith tort claim.

We turn our discussion first to the court of appeals' strict application of a privity of contract analysis to this case. We then proceed to the special relationship that existed between the third-party Administrators and Cary.

### B.

### Exceptions to Privity Requirement

Every contract in Colorado contains an implied duty of good faith and fair dealing. *Transamerica Premier Ins. Co. v. Brighton School Dist. 27J*, 940 P.2d 348, 351 (Colo.1997); *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo.1995) (citing § 4–1–203, 2 C.R.S. (1992)). In typical commercial contracts, a breach of the duty merely results in damages for breach of contract, not independent tort liability. *Wheeler v. Reese*, 835 P.2d 572, 578 (Colo.App.1992).

But, insurance contracts are not ordinary commercial contracts. Every insurer owes its insured a non-delegable duty of good faith and fair dealing. Because of the "special nature of the insurance contract and the relationship which exists between the insurer and the insured," an insurer's breach

of this duty gives rise to a separate cause of action sounding in tort. *Farmers Group, Inc. v. Trimble*, 691 P.2d 1138, 1141 (Colo. 1984). The duty is non-delegable so that insurers cannot escape their duty of good faith and fair dealing by delegating tasks to third parties. Courts have a "heightened responsibility" to scrutinize insurance contracts and invalidate provisions that violate public policy or principles of fairness. *Huizar v. Allstate Ins. Co.*, 952 P.2d 342, 344 (Colo.1998).

In the typical insurance case, only the insurer owes the duty of good faith to its insured; agents of the insurance company—even agents involved in claims processing—do not owe a duty, since they do not have the requisite special relationship with the insured. *See, e.g., Martinez v. Lewis*, 969 P.2d 213, 214 (Colo.1998)(declining to impose a duty of good faith on physicians performing independent medical examinations as part of the claims adjustment process); *Gorab v. Equity General Agents*, 661 P.2d 1196, 1198 (Colo.App.1983) (rejecting an attempt to hold an insurance agent liable for breach of the duty of good faith by an insurance company).

In the typical case, the insured is adequately protected by the non-delegable duty the law imposes on the insurer. However, the existence of this non-delegable duty does not mean that a third-party claims administrator never has an independent duty to investigate and process the insured's claim in good faith. When the actions of a defendant are similar enough to those typically performed by an insurance company in claim administration and disposition, we have found the existence of a special relationship sufficient for imposition of a duty of good faith and tort liability for its breach—even when there is no contractual privity between the defendant and the plaintiff.[7]

We first recognized an exception to the privity requirement in *Travelers Ins. Co. v.*

---

7. We have applied a similar approach outside the domain of insurance contracts. For example, in *Greenberg*, 845 P.2d at 537, we observed that a duty of care "may arise independent of a contractual relationship even though such relationships often provide the basis for tort actions." In that case, we imposed a duty of care on a physician rendering an independent medical ex-

amination, although there was no contractual or physician/patient relationship between the examinee and the defendant doctor. Likewise, in *Cosmopolitan Homes v. Weller*, 663 P.2d 1041 (Colo. 1983), we determined that a homebuilder owed a duty of care to a subsequent purchaser even though there was no privity of contract between the builder and the purchaser.

*Savio,* 706 P.2d 1258 (Colo.1985), where we held that the provider of workers' compensation insurance owes a duty of good faith and fair dealing to an insured employer's employee. *Id.* at 1272. Although that case relies in part on the Workers' Compensation Act, section 8–40–101, 3 C.R.S. (2002) *et seq.,* which makes every worker a third-party beneficiary of his employer's workers' compensation insurance, our decision placed heavy reliance on two other aspects of the case.

First, we relied on the "special nature" of the relationship that exists between an insured and his insurer, holding that this relationship also exists between the insurer and a beneficiary of quasi-insurance benefits:

> The basis for liability in tort for the breach of an insurer's implied duty of good faith and fair dealing is grounded upon the special nature of the insurance contract and the relationship which exists between the insurer and the insured. The motivation of the insured when entering into an insurance contract differs from that of parties entering into an ordinary commercial contract. By obtaining insurance, an insured seeks to obtain some measure of financial security and protection against calamity, rather than to secure commercial advantage.

*Id.* at 1272. Since this statement is true of workers' compensation insurance, we held that the provider of workers' compensation insurance has a duty to deal fairly and in good faith with an injured employee. *Id.* at 1273.

Second, we relied on the fact that a workers' compensation provider, like an insurer in contractual privity with an insured, has a financial incentive to use its leverage to limit claims:

> [O]nce a calamity has befallen an employee covered by workers compensation or an insured covered under a private insurance contract, the injured party is particularly vulnerable because of the injury or loss.... Insurers, backed by sufficient financial resources, are encouraged to delay payment of claims to their insureds with an eye toward settling for a lesser amount than due under the policy. The inequity of this situation becomes particularly appar-

ent in the area of disability insurance in which the insured, often pursued by creditors and devoid of bargaining power, may easily be persuaded to settle for an amount substantially lower than that provided for in the insurance contract.

*Id.* at 1273 (internal quotations and citations omitted).

We extended *Savio* in *Scott Wetzel Servs. Inc. v. Johnson,* 821 P.2d 804 (Colo.1991), where we held that an independent claims adjusting company acting on behalf of a self-insured employer owes a duty of good faith and fair dealing to injured employees when it investigates and processes their claims. *Id.* at 808. Like *Savio, Wetzel* is based in part on the Workers' Compensation Act. However, *Wetzel* makes clear that our departure from the privity requirement is also premised on the fact that the adjuster "effectively delivered the workers' compensation benefits and took many of the steps necessary to perform the employer's duty of good faith and fair dealing owed to the claimants." *Id.* at 812.

> It is the statutory and regulatory structure *and the adjuster's participation in the investigation and processing of claims* that give rise to the duty and not the contract between the employer and claims adjusting service, or the law of principal and agent.

*Id.* at 812 n. 10 (emphasis added).

We also held that the privity requirement was inapplicable in the domain of surety contracts in *Transamerica,* 940 P.2d at 348. In *Transamerica,* we recognized a cause of action in tort for a commercial surety's breach of its duty to act in good faith. Two factors led us to this conclusion. First, we noted that though there are differences in form between an insurance contract and a suretyship agreement, the substance of the two types of obligations are the same. *Id.* at 353. As in an insurance contract, the purpose of a suretyship agreement is not to obtain a commercial advantage, but to shield the beneficiary of the agreement from potentially catastrophic losses in the event that the principal defaults. *Id.* at 352. As a result, unless the surety handles claims in good

faith, the "core purpose" of the suretyship agreement is defeated. *Id.* at 353.

Second, we noted that when the time comes to enforce a suretyship agreement, there is a disparity in bargaining power between the surety and the beneficiary. Absent the prospect of damages for bad faith breach, the surety has no incentive to pay in good faith:

> Contract damages "offer no motivation whatsoever for the insurer *not* to breach. If the only damages an insurer will have to pay upon a judgment of breach are the amounts that it would have owed under the policy plus interest, it has every interest in retaining the money, earning the higher rates of interest on the outside market, and hoping eventually to force the insured into a settlement for less than the policy amount."

*Id.* (quoting *Dodge v. Fidelity & Deposit Co.,* 161 Ariz. 344, 778 P.2d 1240, 1242–43 (1989))(emphasis in *Dodge*).

## C.

### Special Relationship in This Case

A sufficient special relationship existed between the Administrators and Cary to impose a duty of good faith and fair dealing on the Administrators, in light of their central role in claims administration and their financial liability for claims.

Confronted with a situation that is nearly identical to that before us, the Tenth Circuit imposed a duty of good faith and fair dealing on a third-party insurance administrator. *Wolf v. Prudential Ins. Co.,* 50 F.3d 793, 798 (10th Cir.1995). The defendant administrator in *Wolf* is much like the Administrators in the instant case: the administrator had primary control over benefit determinations (including some intermediate benefit appeals) and provided excess liability insurance to the sponsor of the self-funded insurance plan. *Id.* at 797–98.

Given these facts, the Tenth Circuit declined to apply the privity requirement. Rather, it focused "on the factual question of whether the administrator acts like an insurer such that there is a 'special relationship' between the administrator and the insured that could give rise to a duty of good faith." *Id.* at 797. In light of the facts that the defendant administrator performed nearly all of the functions of an insurance company and bore the risk of losses by the insureds, the court held that the administrator had a duty of good faith and fair dealing: "[O]n the facts presented by plaintiffs, Prudential had the power, motive, and opportunity to act unscrupulously. We believe that the Oklahoma Supreme Court would impose a duty on an entity in Prudential's position for the same reasons it imposed the duty on 'true' insurers." *Id.* at 798.

The Tenth Circuit's *Wolf* holding accords with our precedent. In the case before us, the Administrators fulfilled virtually all of the functions normally performed by an insurance company in processing claims and determining whether to deliver insurance benefits. The Trust's only involvement in the operation of the Plan was funding the claims account and hearing final appeals when the Administrators denied benefits. As in other cases where we found an exception to the privity requirement, the Administrators had a significant financial incentive to delay payment of benefits or coerce Cary into a diminished settlement. Cary settled his insurance claim with the City and the Trust for $800,000 after the trial court determined that Cary's medical expenses are covered by the policy. United's reinsurance contract with the City obligates it to reimburse the City for payments in excess of $75,000, but less than $1 million, for any one Arvada employee. In such circumstances, United had a powerful financial incentive to deny or limit claims.[8]

Colorado's statutory policy, stated in section 10–1–101, 3 C.R.S. (2002), is that all persons providing insurance services to the

---

8. This case stands in contrast to cases like *Martinez,* 969 P.2d at 213, which hold that individuals who are merely involved in claims processing do not have a special relationship with the insured sufficient to create a duty of good faith and fair dealing. The physician in *Martinez* did not perform many of the functions of an insurance company, and had no direct financial incentive to deny the insured's claim. Our holding does not affect these cases.

public must "be at all times actuated by good faith in everything pertaining thereto." *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1363 (Colo.1993)(quoting § 10–1–101, 4A C.R.S. (1987)). The application of a strict privity of contract requirement to the case before us would allow agents like the Administrators to act with impunity in the service of their own self-interest, in disregard of this underlying statutory policy and common law principles upon which the special relationship exception to the privity requirement exists.

■ When a third-party administrator performs many of the tasks of an insurance company and bears some of the financial risk of loss for the claim, the administrator has a duty of good faith and fair dealing to the insured in the investigation and servicing of the insurance claim.

### D.

### Standard for Assessing Bad Faith Tort Claim

In "first party" bad faith insurance cases— cases in which an insured sues his insurance company directly—the plaintiff must prove that the conduct of the insurer was unreasonable, and that the insurer either knew that its conduct was unreasonable or acted in reckless disregard of whether it was unreasonable. *E.g. Transamerica*, 940 P.2d at 353–54; *Wetzel*, 821 P.2d at 810; *Savio*, 706 P.2d at 1276. The same standard applies to this bad faith case. On remand, Cary must establish the facts and prove that the Administrators' conduct was unreasonable and the Administrators either knew that their conduct was unreasonable or acted in reckless disregard of whether their conduct was unreasonable.

### III.

Accordingly, we reverse the judgment of the court of appeals and reinstate Cary's tort cause of action against the Administrators for breach of their duty to act in good faith when investigating and servicing the insurance claims. We remand this case to the court of appeals for consideration of any other issues remaining on appeal, and further proceedings consistent with this opinion.

Justice COATS dissents and Justice KOURLIS joins in the dissent.

Justice COATS, dissenting.

Today the majority announces a new civil duty (giving rise to a tort claim for damages) that is neither implied in contract, mandated by statute, nor recognized at common law. In what I consider to be a misconstruction of our prior holdings, the majority finds that certain claims adjusters owe a duty directly to insured parties, despite the absence of any existing contractual or other legal relationship between them, based solely on the amount of influence the adjusters actually exercise over the ultimate decision to allow or not allow coverage. It does so to protect the insured party by providing a disincentive for wrongful behavior by agents of the insurer, but also by providing an alternate source of recovery.

While its goal may be laudable, I do not believe the majority's conclusion arises out of a legal theory. Social policy is clearly an important consideration in the interpretation and development of the law, but it cannot be the primary basis for judicial resolution of individual cases and controversies. Because I believe that such policy-driven holdings create unworkable rules of law and generally undermine confidence in the judicial process, I would leave public policy initiatives of this kind to the General Assembly. I therefore respectfully dissent.

Initially, it must be understood that the liability created by the majority today is separate and distinct from liability for insurance coverage under the terms of a contract. It is of course the insurer who is contractually liable to provide coverage under the terms of an insurance contract. Along with about half the other jurisdictions in this country, Colorado has also allowed that an insurer may be separately liable in tort for damages it causes by wrongfully denying insurance coverage.[1] Without disputing the district

---

1. *See* Douglas R. Richmond, *The Two–Way Street of Insurance Good Faith: Under Construction, But Not Yet Open*, 28 Loy. U. Chi. L.J. 95, 107 n. 74 (1996)(citing twenty-nine states that have recognized a common law tort for bad faith breach of a first-party insurance contract); *see also* Dominick C. Capozzola, *First–Party Bad Faith: The Search for a Uniform Standard of Culpability*, 52 Hastings L.J. 181, 182 n. 5 (2000)(finding twenty-five states that explicitly allow common law tort recovery, but citing five others that have allowed for "similar damages on expanded no-

court's judgment that Cary is not a third-party beneficiary of the contract between the City and United, however, and without suggesting that the legal relationship between the City and United is a sham or that United is actually liable to Cary for coverage on his contract with the City, the majority holds that certain agents of an insurer, depending upon their contractual agreements with the insurer and their actual participation in the claims process, may also be directly liable to a policyholder for damages caused by the insurer's denial of coverage.

The majority suggests that it does no more than apply existing "exceptions to the privity requirement" of a claim for bad faith breach of contract, and it likens its approach to other instances in which we have found a duty of care in the absence of a contractual relationship. *See* maj. op. at 466–467 & n. 7. In my view, this characterization not only misconstrues our prior holdings but highlights a fundamental difference in our understanding of the theoretical underpinnings of the tort of bad faith breach. While a tort by its very nature is an injury or wrong that is independent of contract, the tort of bad faith breach is unusual in that it recognizes liability for the wrongful breach of a duty to comply with the terms of an insurance contract. Unlike other duties of care that are independent of contractual relationships, the duty created by the majority in this case subjects non-contracting parties to liability for the denial of insurance coverage under the terms of a contract.

We have held that all contracts contain an implied duty of good faith and fair dealing, *see Transamerica Premier Ins. Co. v. Brighton School Dist. 27J,* 940 P.2d 348 (Colo. 1997), but even a wrongful breach does not always give rise to a claim for damages in tort. It is only the "special nature of the insurance contract and the relationship which exists between the insurer and the insured" that can give rise to tort liability for a wrongful breach. *Farmers Group Inc. v. Trimble,* 691 P.2d 1138, 1141 (Colo.1984). We have also recognized that insurance-like relationships can be created and corresponding duties imposed by statute rather than contract, similarly giving rise to an action in tort for wrongful breach of those duties. Whether the special duty is implied by a contractual relationship or imposed by statute, however, a breaching party can be liable only for damages suffered by someone to whom it owes a duty.

Our holdings that are characterized by the majority as "exceptions" to the privity requirement of a bad faith breach of contract claim are, to my mind, not exceptions at all. Some of the examples cited by the majority do not alter the privity requirement in any way, while the others do not even involve a bad faith breach of contract. In *Transamerica,* for instance, the contractual relationship of the parties was never in doubt. The issue before the court concerned only the question whether the duty owed by a surety to its beneficiary is sufficiently like that of an insurer to its insured to implicate similar consequences for a breach. *Transamerica,* 940 P.2d at 349. Largely because the legislature chose to classify a suretyship agreement as an insurance contract, we held that a wrongful breach of the surety's similar contractual duty to its beneficiary should also give rise to an action in tort for bad faith breach of the contract. *Id.* at 353–54.

By contrast, neither *Travelers Ins. Co. v. Savio,* 706 P.2d 1258 (Colo.1985), nor *Scott Wetzel Servs., Inc. v. Johnson,* 821 P.2d 804 (Colo.1991), was based on the breach of a contract. In *Savio,* we found that because the statutory workers' compensation regulatory scheme had much in common with insurance and because the statutory scheme created a duty, the wrongful breach of that duty should give rise to an action in tort just like the wrongful breach of the contractual duty owed by an insurer to its insured. *Savio,* 706 P.2d 1258. In *Wetzel,* we made even more clear that the duty giving rise to a tort claim was created by statute, by finding a legislative intent to impose the duty to injured workers not only on employers and their workers' compensation carriers but even on independent claims adjusters. *Wetzel,* 821 P.2d at 811. To be sure, the nature of the functions actually performed by workers' compensation claims adjusters was an

tions of contract law," and two more that have

enacted statutes covering bad-faith actions).

important factor in determining that their involvement was contemplated by the regulatory scheme and therefore that they fell within the class upon which the statute imposed a duty of fair dealing in processing workers' compensation claims. We did not, however, even remotely suggest that mere involvement in the processing of insurance claims creates a legal relationship that includes a special duty of good faith and fair dealing to insured parties.

By deriving a duty to an insured person from the adjuster's separate relationship with the insurer and actual participation in the claims process, the majority, in my opinion, confounds the existence of a legal duty with the questions of causation and culpability; contravenes well-accepted agency principles; and imposes liability without advance notice or consistent application of the law.

First, despite acknowledging that a "special relationship" is essential, the majority actually eliminates the need for any legal relationship between the claims adjuster and insured, premising its new duty instead on "the power, motive, and opportunity to act unscrupulously in the investigation and servicing of the insurance claims." Maj. op. at 463–464. Motive and opportunity to see that coverage is denied may be relevant to the question whether United acted in good faith, but they clearly do not imply a duty to deal in any particular way with someone whom it does not insure. The significant question is not whether United owes a duty of good faith and fair dealing to someone, but to whom it owes such a duty. Similarly, the significance of United's involvement in processing claims for the City is not that it is acting *like* an insurer but rather that it is acting *for* an insurer. To the extent that it insures the City with a stop-loss or reinsurance policy, it has a "semi-fiduciary" relationship with the City, its insured, and owes the City a special duty that potentially conflicts with a similar duty to the City's insured.

Second, by creating a legal relationship that is neither implied by the agreement of the parties nor mandated by statute, the majority resolves this pending controversy by creating duties and liabilities that never before existed, in this jurisdiction or virtually anywhere else, and that were not reasonably foreseeable. Although a significant number of jurisdictions recognize a separate recovery in tort for bad faith breach of contract, far fewer join our readiness to extend a similar cause of action to the denial of statutory workers' compensation claims.[2] Virtually none has found an insurance-like duty not grounded in either contract or statute.

In *Wolf v. Prudential Ins. Co.,* 50 F.3d 793 (10th Cir.1995), upon which the majority heavily relies, a panel of the Tenth Circuit Court of Appeals found the relationship between an insured and an independent claims adjuster to be a question of fact, not subject to summary judgment, where the adjuster was not only an insurance company itself but reinsured the nominal insurer, a church, and provided the church with the very insurance policy under which the coverage at issue was written. Even then, however, the Tenth Circuit did not find such a duty to exist in federal law but only predicted that the Oklahoma Supreme Court would impose such a duty if faced with a similar situation. The foresight of the federal court in this regard is at least questionable in light of Oklahoma's subsequent rejection of the *Wetzel* rationale and refusal to extend the bad faith tort even to a statutory workers' compensation claim. *See Kuykendall v. Gulfstream Aerospace Technologies,* 66 P.3d 374 (Okla.2002).

Finally, because I cannot find any theoretical basis for this duty, its scope is also unclear to me. Despite its reference to the broad legislative declaration in § 10–1–101, 3 C.R.S. (2002), the majority appears to reject the petitioners' argument that an action in tort should be permitted against all persons involved in the provision of insurance services, limiting the sweep of its holding instead to insurance claims adjusters having a reinsurance relationship with the actual insurer. It is unclear to me, however, the

---

**2.** *See, e.g., Natividad v. Alexsis, Inc.,* 875 S.W.2d 695 (Tex.1994). *See also Kuykendall v. Gulfstream Aerospace Technologies,* 66 P.3d 374 (Okla.2002), Hodges, J., dissenting, at n. 33 (surveying jurisdictions that have decided whether or not to recognize common law tort claims for bad faith in the workers' compensation context).

extent to which the holding rests on a virtual abdication of its role by the actual insurer, which the majority clearly implies was the case here. Furthermore, although the majority does not discuss or assign any particular weight to the implications of governmental immunity in this case, it makes clear that in "the typical case" an insured is adequately protected by the non-delegable duty of his insurer. Maj. op. at 466. Unless the unavailability or inadequacy of recovery from the insurer is a consideration, however, it remains unclear to me why the insured is not adequately protected by the well-accepted principles of agency law.

I would be considerably more reticent than the majority about judicially creating duties and liabilities, not heretofore recognized at law, especially when they conflict with other policy choices of the legislature and seem to rest so heavily on the equities of individual cases. Because I disagree with both the majority's rationale and its judgment, I respectfully dissent.

I am authorized to state that Justice KOURLIS joins in this dissent.