Thomas A. CARY and Beth Hanna, individually and on behalf of their minor daughter, Dena Cary, Plaintiffs–Appellants and Cross–Appellees,

v.

UNITED OF OMAHA LIFE INSURANCE COMPANY and Mutual of Omaha of Colorado, Inc., d/b/a Antero Health Plans, Defendants–Appellees and Cross–Appellants.

No. 00CA0681.

Colorado Court of Appeals,
Div. I.

Nov. 20, 2003.

Certiorari Granted June 14, 2004.

Wilcox & Ogden, P.C., M. Anne Wilcox, Ralph Ogden, Denver, Colorado, for Plaintiffs–Appellants and Cross–Appellees.

Kutak Rock, LLP, Melvin B. Sabey, Gerard V. Reardon, Denver, Colorado, for Defendant–Appellee and Cross–Appellant United of Omaha Life Insurance Company.

Kennedy & Christopher, P.C., John R. Mann, Christopher K. Miller, Denver, Colorado, for Defendant–Appellee and Cross–Appellant Mutual of Omaha of Colorado, Inc.

Opinion by Judge ROY.

Defendants, United of Omaha Life Insurance Company and Mutual of Omaha of Colorado, Inc., d/b/a Antero Health Plans (administrators), appeal the summary judgment which concluded that a group health plan managed by them covered medical and hospital expenses incurred by plaintiffs, Thomas A. Cary (father) and Beth Hanna (collectively insureds). We reverse the summary judgment and remand the case for further proceedings consistent with the views expressed in this opinion.

This matter is before us on remand from the supreme court. The trial court had granted the administrators' motion for summary judgment on the issue of duty, concluding that as third-party administrators of a self-insured municipal health plan, they did not owe insureds a contractual duty amenable to a claim of bad faith breach of an insurance contract. At the same time, the trial court granted insureds' motion for summary judgment on the issue of coverage. The insureds appealed the summary judgment in favor of administrators, and the administrators cross-appealed the summary judgment on the coverage issue.

We affirmed the judgment on insureds' appeal and did not address the administrators' cross-appeal. *Cary v. United of Omaha Life Ins. Co.*, 43 P.3d 655 (Colo.App.2001). The supreme court reversed and remanded for consideration of any remaining issues on appeal. *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462 (Colo.2003). We now address the cross-appeal.

Father was an employee of the City of Arvada and was a member of a group health plan (Plan) the city provided to its employees and their families. The Plan was designed and funded by the Arvada Medical and Disability Program Trust Fund (Trust) and was administered by administrators, who processed all claims and determined coverage, subject to appeal to the Trust.

Insureds' child was a beneficiary of the Plan and had a history of Bipolar I Disorder, a biologically based mental illness characterized by both manic and major depressive episodes, the treatment of which was covered by the Plan. On June 7, 1997, the child put a rifle under her chin and shot herself in an apparent suicide attempt. As a result, she required extensive treatment, hospitalization,

and multiple surgeries. Insureds applied for benefits under the Plan, but administrators denied benefits, citing, as justification, the exclusion for self-inflicted injuries.

Insureds sued the city, the Trust, and administrators, seeking both a declaratory judgment that the Plan covered the child's injuries and damages for bad faith breach of an insurance contract. On cross-motions for summary judgment, the trial court granted partial summary judgment for insureds, concluding that the self-inflicted injury exclusion of the Plan was ambiguous and, even if the Plan were not ambiguous, a 1994 Summary Plan Description (1994 SPD) rendered the exclusion ambiguous. The trial court then resolved the ambiguity in favor of coverage. The city and the Trust settled with insureds and are not parties to this appeal or cross-appeal.

## I.

■ At the outset, insureds contend that administrators lack standing to challenge the trial court's ruling on coverage because administrators were not parties to the Plan which formed a contract between father and the City of Arvada. We disagree.

■ To have standing to appeal, a person must either be a party to the action or be substantially aggrieved by the disposition of the case in the lower court. *Kornfeld v. Perl Mack Liquors, Inc.*, 193 Colo. 442, 567 P.2d 383 (1977); *see Bush v. Winker*, 907 P.2d 79 (Colo.1995); *see also* § 13–51–106, C.R.S. 2003 ("Any person interested under a . . . written contract . . . or whose rights, status, or other legal relations are affected by a . . . contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder.").

Here, administrators were substantially aggrieved by the trial court's declaratory judgment concluding that the Plan covered the child's injuries because that determination directly affects insureds' claims against them.

The supreme court concluded that the administrators owed insureds a duty amenable

to a claim of bad faith breach of an insurance contract. The supreme court reasoned that a "sufficient special relationship existed between the [a]dministrators and [insureds] to impose a duty of good faith and fair dealing on the [a]dministrators, in light of their central role in claims administration and their financial liability for claims." *Cary v. United of Omaha Life Ins. Co., supra*, 68 P.3d at 468. The court also stated that "administrators had primary control over benefit determinations, assumed some of the insurance risk of loss, undertook many of the obligations and risks of an insurer, and had the power, motive, and opportunity to act unscrupulously in the investigation and servicing of the insurance claims." *Cary v. United of Omaha Life Ins. Co., supra*, 68 P.3d at 465.

Because the supreme court concluded that administrators had a duty to act in good faith in administering the Plan, it follows that they have standing to challenge the trial court's conclusion that the Plan covers the cost of treating the child's injuries. The issue of coverage is a central predicate to any claim of bad faith breach of the insurance contract.

## II.

In their cross-appeal, administrators assert that the trial court erred when it concluded that the Plan was ambiguous as to coverage for self-inflicted injuries and then resolved that ambiguity in favor of coverage for the child's self-inflicted injury. We agree.

■ Insurance policies are contracts. If they are clear and unambiguous, then they require no construction or interpretation and are to be enforced as written. *Cruz v. Farmers Ins. Exch.*, 12 P.3d 307 (Colo.App. 2000); *Wieprzkowski v. State Farm Mut. Auto Ins. Co.*, 976 P.2d 891 (Colo.App.1999).

■ In determining whether a policy is ambiguous, the courts must read the entire policy as a whole and give the words used their plain meaning according to common usage. *In re Estate of Heckman*, 39 P.3d 1228 (Colo.App.2001). When words are not defined in the policy, they are to be given their plain, ordinary, customary, and accept-

ed meaning. An insurance policy is ambiguous if it is reasonably susceptible of more than one interpretation, but it is not rendered ambiguous merely because the parties disagree on its interpretation. *Safeco Ins. Co. v. Robertson*, 994 P.2d 488 (Colo.App. 1999).

When, as here, the evidence is limited to the documents, the issues of a contract's ambiguity and correct interpretation are matters of law to be determined by the court. *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992 P.2d 636 (Colo.App.1999).

The Plan defines "illness" as "a physical or mental disorder, including pregnancy." "Injury" is defined as: "[A]ccidental bodily injury which occurs independently of Illness. Injury does not include self-inflicted bodily Injury either while sane or insane, or disease or infection (except pyogenic infection occurring through an accidental cut or wound)."

The term "Covered Expenses" is defined as "a Reasonable and Customary medical expense . . . which expense is Medically Necessary for the treatment of an Injury or an Illness not specifically excluded or otherwise limited under this Plan." The Plan contains a specific exclusion from benefits for "[c]harges in connection with a self-inflicted injury, whether sane or insane."

Therefore, self-inflicted injury, incurred whether the claimant is sane or insane, is a limitation on coverage under the definition of "Injury" and is a separately provided plan exclusion.

The trial court initially concluded, and we agree, that the second sentence of the definition of "Injury," which excludes self-inflicted injuries whether the claimant is sane or insane, is not in and of itself ambiguous. *See Bigelow v. Berkshire Life Ins. Co.*, 93 U.S. 284, 287, 23 L.Ed. 918 (1876)(when used to exclude intended self-destruction in a life insurance policy, the words "sane or insane" have a "precise, definite, and well-understood meaning").

However, the trial court went on to conclude that the Plan was ambiguous based on the phrase in the first sentence of the definition of "Injury": "accidental *bodily* injury which occurs independently of Illness." The

court reasoned that the child was suffering from a treatable and covered mental illness, the self-inflicted injury was not independent of the covered mental illness, and, therefore, the Plan covered treatment of the injuries.

In our view, the trial court's interpretation strains the definition of "Injury." We read the phrase "which occurs independently of Illness" in the definition of "Injury" as modifying "accidental bodily injury," not "Injury." The self-inflicted injury limitation is contained in a separate, independent, and immediately subsequent sentence and, in our view, modifies "Injury." That is, no intentionally self-inflicted injuries are covered. The language in the Plan limiting the definition of "Injury" by excluding from that definition self-inflicted injuries is clear and unambiguous and is not narrowed by the phrase requiring accidental injuries to occur independently of illness. We hold that a reasonable insured would not find the language to be ambiguous or confusing.

The trial court did not consider, and we need not consider, the effect of the identical phrase as a Plan exclusion.

Therefore, the trial court erred in concluding that the Plan was internally ambiguous in limiting coverage to exclude self-inflicted injuries whether the claimant is sane or insane.

### III.

Administrators also assert that the trial court erred in relying on the 1994 SPD in determining that Plan was ambiguous. We agree.

The Plan was not distributed to the city employees. Instead, the Trust or the administrators, or both, distributed documents summarizing the Plan to the city employees. These summary documents may become a part of a plan or insurance policy, disclaimers to the contrary notwithstanding, and, if they conflict with the plan or are incomplete, they may create an ambiguity which must be resolved in favor of coverage. *See Tepe v. Rocky Mountain Hosp. & Med. Servs.*, 893 P.2d 1323 (Colo.App.1994)(where provisions of brochure conflicted with policy, conflict was resolved in favor of coverage);

*see also Holdridge v. BCS Life Ins. Co.,* 863 F.Supp. 1366 (D.Colo.1994)(applying Colorado law); *Blue Cross & Blue Shield, Inc. v. Chestnut Lodge, Inc.,* 81 Md.App. 149, 567 A.2d 147 (1989).

In *Blue Cross,* the Maryland court explained the majority view that exclusions stated in the policy but not in the summary booklet should not be enforced:

> The majority of the courts addressing the issue have refused to enforce policy exclusions contained in the master contract but which have been omitted from the benefits booklet or other explanatory materials provided to the insured. Whether expressed in terms of estoppel or waiver, the underlying rationale of these cases is the unfairness of permitting an insurer, who usually drafts the benefits booklet, or at the very least, reviews it to determine its consistency with the master policy, to raise, as an impediment to coverage, a provision in the master policy which is not contained in the explanatory literature. They recognize that, to construe the provisions in the benefits booklet indicating that coverage is determined by reference to the master contract would render such provisions "a vast, additional exclusionary condition to coverage, making their omission from the [Blue Cross] brochure inexcusable," *Van Vactor v. Blue Cross Association,* [50 Ill. App.3d 709, 716, [8 Ill.Dec. 400, ]365 N.E.2d 638[, 644] (1977)], and would "encourage insurers to withhold the master policy and include few important provisions" in the benefits booklet or other explanatory literature provided to insureds. Thus, language in the benefits booklet to the effect that benefits are subject to the terms of the master policy does not change the result; an insurer will not "be allowed to hide behind the technical provisions of the policy when the misleading shortcomings of his booklet are exposed." *See Bauer v. Insurance Company of North America,* 351 F.Supp. [873,] 876 [ (E.D.Wis.1972) ].

*Blue Cross & Blue Shield, Inc. v. Chestnut Lodge, Inc.,* 567 A.2d at 150–51 (citations omitted).

Here, we consider three supplemental or summary documents: the 1994 SPD, a 1997 SPD, and a 1997 brochure prepared and distributed by administrators.

SPDs are summaries of the Plan or policy written in plain language. Therefore, by definition, SPDs do not contain all the terms and conditions of the Plan. In this case, they contain many explanations of specific benefits, for example, transplants, the amounts the Plan will pay, and the way that claims are processed.

The 1994 SPD, upon which insureds now rely in arguing for an ambiguity, was approved by the Trust and was issued and distributed to city employees from 1994 until 1997, when the 1997 SPD was approved. While the 1994 SPD used the term "covered expenses," it did not define that term. And while it listed a significant number of exclusions, it did not include self-inflicted injury as an exclusion.

The 1997 SPD was approved after the child injured herself; was effective as of January 1, 1997; had been in draft form for some months prior to approval; and was used by administrators in reviewing and denying insureds' claim. The 1997 SPD presented a fundamental change in the way the Plan was administered and delivered services. The Plan was to use a "point of service" method similar to an HMO, requiring, among other things, that employees select a primary care physician from a panel of physicians, and the benefits differed depending on whether the services were provided by network providers or others. This point of service structure was owned and operated by administrators.

The 1997 SPD used the term "covered service or supply," but did not define it. It also used the term "medically necessary service or supply," defining it as "one which is ordered by a Primary Care Physician for-In Network Benefits or a physician for Out-of Network Benefits and which [administrators] determine[ ] [is appropriate]." The 1997 SPD listed exclusions from coverages, which included "Charges for treatment of an intentionally self-inflicted injury or sickness, occurring while sane or insane." Insureds relied on the 1997 SPD when this action

commenced and attached a copy of it to the complaint.

The 1997 brochure was entitled "Mutual [of] Omaha Companies Point of Service Plan Summary" and was distributed to father in late 1996. It was a two-page description of the point of service delivery system that was described in more detail in the 1997 SPD. It contained a chart describing benefits for particular treatments, conditions, or physicians, and it explained the difference in benefits for services performed in- and out-of-network. It also listed the exclusions from coverage including, "whether the member is sane or insane, from an intentionally self-inflicted injury or sickness or suicide or attempted suicide." Administrators used this language in denying insureds' claim, rather than that contained in the Plan or the 1994 or 1997 SPD.

Father attended a meeting of city employees in November 1996 where the new point of service health care delivery system was introduced. The 1997 brochure was distributed to the attendees, including father, and had attached application forms. In his deposition, father testified he received the summary and read and understood it at or after the meeting. He also testified that, after consultation with his wife, he applied for the point of service delivery system on the application forms provided. This system delivered medical care and services to the child at the time of the incident. The trial court did not consider this document in its order granting summary judgment.

While the 1994 SPD could render the plan ambiguous, we conclude that as of father's receipt and reading of the 1997 brochure in late 1996 and signing up for the point of service delivery system based thereon, the Plan was not reasonably susceptible of more than one interpretation with respect to the coverages and exclusions related to self-inflicted injuries. *See Safeco Ins. Co. v. Robertson, supra.*

Therefore, the unambiguous Plan was not rendered ambiguous by the SPDs and the 1997 brochure circulated by the Trust and administrators to insureds. The Plan excluded self-inflicted injuries, and there was no coverage for the injuries sustained by the child.

### IV.

Insureds also argue that the exclusion for self-inflicted injuries is contrary to public policy and, therefore, is unenforceable. More particularly, insureds rely on § 10–16–104(5.5), C.R.S.2003, which requires that health plans regulated by the Colorado Division of Insurance "provide coverage for the treatment of biologically based mental illness that is no less extensive than the coverage provided for any other physical illness" and further includes bipolar affective disorder and major depressive disorder in its definition of biologically based mental illness. We disagree.

We agree with both parties that § 10–16–104(5.5) does not apply to the Plan because it is not regulated by the Colorado Division of Insurance. Insureds further argue, however, that even though § 10–16–104(5.5) was not effective in 1997 and does not apply to the Plan, we should look to it as a statement of public policy applicable to this case. We are not persuaded. If the General Assembly wished to make the statute a statement of public policy applicable to the Plan, it could expressly do so, or it could make the Plan subject to regulation by the Colorado Division of Insurance, or both.

We affirm the trial court's award of costs to administrators pursuant to C.R.C.P. 54(b) as prevailing parties.

The summary judgment is reversed, and the case is remanded to the trial court for further proceedings consistent with the views expressed in this opinion.

Chief Judge DAVIDSON and Judge METZGER * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

