Britt E. TIDWELL, an incapacitated person, by his conservator, Xavier O. TIDWELL, Petitioner,

v.

CITY AND COUNTY OF DENVER, a municipal and home rule city of the State of Colorado, Respondent.

No. 02SC532.

Supreme Court of Colorado,
En Banc.

Nov. 10, 2003.

Downey, Miller and Hopp, Wesley W. Hoyt, Englewood, Colorado, David I. Levy, Boulder, Colorado, Attorneys for Petitioner.

Senter Goldfarb & Rice, L.L.C., Thomas S. Rice, Brian K. Matise, Denver, Colorado, Attorneys for Respondent.

Justice KOURLIS delivered the Opinion of the Court.

In this case, Officer Timothy McAleer, a Denver Police Officer, was in his patrol car chasing a green Oldsmobile in an attempt to stop and apprehend the driver when the Oldsmobile failed to obey a stop sign and collided with a white limousine, killing the driver of the limousine and seriously injuring its passenger, Britt Tidwell, the plaintiff in this case. Tidwell brought a tort action against the City and County of Denver (the "City") to recover for his injuries associated with the accident.

The City argued that it was immune from suit under the Colorado Governmental Immunity Act (GIA), section 24–10–106, 7B C.R.S. (2003). Tidwell countered that the provisions of the GIA were unavailable to the City because the Officer failed to activate his lights and siren during the chase. The trial court concluded that the City was immune from suit.

The court of appeals affirmed the decision of the trial court in *Tidwell ex rel. Tidwell v. City and County of Denver,* 62 P.3d 1020, 1023 (Colo.App.2003), on other grounds, holding that the Officer was in "pursuit," but since the pursuit was investigatory in nature, he was not required to use emergency signals under section 42–4–108(3), 11 C.R.S. (2003).

In addition to addressing the immunity issues, the trial court also entered summary judgment in this case in favor of the City because it determined that Tidwell introduced no evidence at the evidentiary hearing on immunity issues to show that any failure on the part of the City caused the accident between the Oldsmobile and the limousine.

Resolution of this case requires us first to determine whether the Officer was "pursuing" the driver of the Oldsmobile and, if so, whether the pursuit was investigatory. We now hold: 1) that Officer McAleer was engaged in a "pursuit" of the Oldsmobile; and 2) that the pursuit was not investigatory in nature as that term appears in the statute. Accordingly, Officer McAleer was required to activate his emergency signals in order for the City to claim the protection of governmental immunity under the terms of the GIA.

We also hold that it was inappropriate for the trial court to enter summary judgment for the City on causation. The City's then pending summary motion did not address causation. Rather, the City raised causation in the context of the governmental immunity analysis, arguing that the accident did not result from the Officer's conduct. That inquiry was appropriate. However, Tidwell was not permitted to engage in discovery on that point, and was not permitted to present facts at the hearing supporting his contention that the Officers actions had a causative effect in the accident. Lastly, the trial court

should have afforded the benefit of inferences to the plaintiff and evaluated causation only for the limited purposes of the 12(b)(1) motion. Accordingly, we reverse that judgment as well and return this case to the court of appeals with directions to remand it to the trial court for further proceedings.

## I. Facts

On Saturday, May 4, 1996, at approximately 6 o'clock on a clear and dry morning, in the City and County of Denver, Officer McAleer was traveling north on Colorado Boulevard when he made a right-hand turn onto 23rd Avenue (23rd) and began heading east. Just after Officer McAleer turned onto 23rd, he noticed an older-model green Oldsmobile stop abruptly a few blocks ahead of him on 23rd, somewhere between Cherry and Dahlia Streets. The erratic driving of the Oldsmobile caught the officer's attention since there was no other traffic in the early morning hours in this residential neighborhood.

As Officer McAleer approached the car, he noticed the old age of the car and the fact that it had temporary tags instead of license plates. He also noticed that the car had stopped in front of a retail business section of the block. This, combined with the Oldsmobile's sudden stop, led Officer McAleer to form a suspicion either that the car was stolen or that the occupants of the car might have been preparing to engage in other criminal activity.

Reasonably suspecting that a crime "either had been or was about to be committed," Officer McAleer pulled up behind the Oldsmobile and activated his yellow "stage one" overhead lights or "wigwags." Officer McAleer activated only the wigwags (instead of the "stage two" red, blue and white rotating lights or "stage three" lights and siren) because, he believed, his sole responsibility was to let other drivers know that he was stopped and that they needed to stay to the left of his car. As he later explained at the evidentiary hearing following the accident, Officer McAleer believed that the multi-colored lights and siren were used only to signify an intent to stop a vehicle ahead of him. Since the vehicle he was investigating was already stopped and should have been aware of his intent to investigate, there was no need for anything except the wigwags, according to Officer McAleer.

By this point, a passenger had already exited the Oldsmobile and was standing on the sidewalk. When Officer McAleer got out of his car, he told the passenger to get back into the Oldsmobile. After arguing with Officer McAleer briefly, the passenger took off running, first through a nearby park and then disappearing from sight. Simultaneously, while Officer McAleer was still outside of his car, the Oldsmobile sped away with its passenger door open. According to Officer McAleer, the behavior of both the driver and the passenger confirmed his reasonable suspicions that a crime had been committed.

Officer McAleer hurried back to his car in hopes of "recontacting" the Oldsmobile. Though Officer McAleer testified he was not certain about the possibility of finding the Oldsmobile since it was speeding down 23rd "as fast as [it] could go," he explained that when he left the scene, his goal was to find the car and apprehend the driver. As Officer McAleer put his car into gear, he saw the Oldsmobile turn left, heading north down an "unknown" street. From his point of departure, Officer McAleer drove "about 40–45 miles per hour" until he arrived at the alley between Eudora and Elm Streets (1.5 blocks east). The speed limit along 23rd at this time was 30 miles per hour. At no point did Officer McAleer turn on his stage two rotating lights or his stage three siren.

When Officer McAleer got to the alley, he slowed down significantly in order to glance down the alley. When he did not see the Oldsmobile, he resumed speed until he got to the next alley between Elm and Fairfax. After failing to locate the car down that alley, he accelerated again toward Fairfax. As he slowed down to look north down Fairfax, Officer McAleer noticed taillights a few blocks ahead that he believed could be the Oldsmobile's.

He then turned left onto Fairfax and rushed toward the car. Just as he was completing the turn, however, Officer McAleer saw a flash of light and then a cloud of smoke. Seconds later, Officer McAleer ap-

proached the intersection of 26th Avenue (26th) and Fairfax, where he discovered that the Oldsmobile had collided with a white limousine that was heading west down 26th. Britt Tidwell was a passenger in that limousine. The limousine ended up on its side on a lawn on the northwest corner of the intersection. The Oldsmobile was facing south, resting further down Fairfax, just north of the intersection.

An investigation later revealed that the Oldsmobile was traveling between sixty and seventy miles per hour at the time of the impact. The limousine was traveling at a rate of approximately twenty-six miles per hour. The Oldsmobile failed to obey the stop sign at 26th and Fairfax. The limousine had the right of way, and no stop sign. The driver of the limousine died and Tidwell suffered serious brain injuries in the accident. Vincent Reedy, the driver of the Oldsmobile, was later convicted of vehicular homicide.

## II. Legal Proceedings

Tidwell brought a negligence action against both the City and Officer McAleer in 1998.[1] Specifically, he charged that Officer McAleer caused his injuries by engaging in a high-speed pursuit of an automobile without using lights or siren to warn nearby drivers. He asserted that Officer McAleer initiated and maintained a reckless and careless high-speed chase without following normal police procedures and thereby violated section 42–4–108(3), which requires police officers engaged in a pursuit to use "audible or visual signals" when they are going to violate normal traffic laws.

On February 22, 2001, the trial court held an evidentiary hearing pursuant to *Trinity Broadcasting of Denver, Inc. v. City of Westminster*, 848 P.2d 916 (Colo.1993) (the "*Trinity* hearing") to determine whether the City was immune from Tidwell's suit under the

GIA. During more than two days of testimony, the trial court heard from several police officers, including Officer McAleer, and several experts on motor vehicle accidents. The court also had in evidence the deposition of Mr. Adolfo Fierro, who lives near the intersection of 26th and Fairfax.

The trial court ruled that the City was immune from suit based on its finding that Officer McAleer was not engaged in a "pursuit." Accordingly, and pursuant to *Trinity Broadcasting*, it dismissed the case for lack of subject matter jurisdiction under C.R.C.P. 12(b)(1). The court held that since there was no pursuit, Officer McAleer was not required to use audible or visual signals. Thus, the City was granted immunity from suit under the "emergency vehicle" exception to section 24–10–106(1)(a), which would normally waive immunity from suit "for injuries resulting from ... the operation of a motor vehicle" owned by the City.

Importantly, the trial court refused to hear evidence that touched on matters not related to the "pursuit." When Tidwell offered the testimony of one expert who was going to explain that the collision would have been avoided if the limousine had been driving even 1–2 miles per hour slower, the court did not allow it. The court explained that any inferences as to whether the lights and siren would have caused the limousine to slow down were only relevant to cause, not to pursuit.

Instead, the vast majority of testimony related to Officer McAleer's speed between 23rd and Dahlia and 26th and Fairfax and why he did not activate his lights and siren. During the presentation of evidence, the City's experts explained how the officer's speed indicated he was not in "pursuit" as that term is defined by Denver Police Department Operations Manual (the "Police Manual").[2] In contrast, Tidwell's expert fo-

---

1. The City is the only remaining party to this suit as Officer McAleer was dismissed as a party with prejudice on October 18, 1999 per a stipulation of the parties.

2. The Denver Police Department Operations Manual, under 204.01(1)b.1, defines "Pursuit" as follows:

Pursuit shall mean an active attempt by an officer (operating a department vehicle) to apprehend an operator of a motor vehicle who, having been given a visual and audible signal by the officer directing such operator to bring the vehicle to a stop, fails to obey such direction, and either increases the vehicle's speed, extinguishes the vehicle's lights or

cused on why the evidence did support the existence of a "pursuit." In addition, Tidwell's main witness was Officer McAleer himself, who explained why he did not activate his lights and siren.[3] He stated that in his opinion, the rotating lights and siren (stage three) are used only to communicate to a vehicle being pursued. He said that because the driver of the Oldsmobile knew or should have known that Officer McAleer wanted to "recontact" him, there was no need to use the lights or the siren. Specifically, Officer McAleer testified that to him it only made sense to activate the lights and siren when an officer is "a car length or two" behind the party he is pursuing. Otherwise, he said, "it just seems kind of strange."

During his direct examination, Officer McAleer unequivocally agreed that police procedures require him to activate the lights and siren whenever he is engaged in a pursuit. But, he said, he was not required to use them in this instance since, in his opinion, he was not involved in a "pursuit." Officer McAleer even testified that his intent in following the Oldsmobile was to apprehend the driver and agreed that police procedures do require him to activate the lights and siren whenever an officer attempts to apprehend a driver. However, he said, the lights and siren are really only required when there are other "vehicles or people" around who are "jeopardized."

Officer McAleer agreed that it was likely he was exceeding the speed limit at some point during his attempt to "recontact" the driver. He also testified that the lights and siren would have been helpful to warn other drivers on the road, provided they were within "earshot." Yet, he insisted that because he was not engaged in a "pursuit," there was no requirement at all to activate the lights or the siren.

Relying solely on the definition of "pursuit" found in the Police Manual, the trial court agreed with the City that there was no pursuit in this case. Thus, it held, the City was immune from suit. The trial court also

proceeded to enter summary judgment for the City on the grounds that the officer's conduct did not cause the accident.

The court of appeals affirmed the decision of the trial court, but on different grounds. Contrary to the trial court, it held that there was indeed a "pursuit" in this case but that the City was nonetheless entitled to governmental immunity under the GIA's "emergency vehicle exception." *Tidwell*, 62 P.3d at 1023. The court of appeals held that, even though he was engaged in a pursuit, Officer McAleer was not required to activate his lights and siren under section 42–4–108(3), which states that a police vehicle need not turn on its audible or visual signals when the pursuit is investigatory in nature.

### III. Immunity Analysis

#### 1. Governmental Immunity Act (GIA)

Section 24–10–106(1) of the GIA states that as a general rule, "[a] public entity shall be immune from liability in all claims for injury which lie in tort." The statute also enumerates several exceptions to the rule that waive sovereign immunity for tort actions. Pertinent to this case is the first exception under the statute, which announces that "immunity is waived by a public entity in an action for injuries resulting from . . . the operation of a motor vehicle, owned or leased by such public entity." § 24–10–106(1)(a). There is an exception to this exception for emergency vehicles falling under the ambit of section 42–4–108. *Id.*

Under section 24–10–106(1)(a), a public entity is immune from any tort suit if the emergency vehicle is "operating within the provisions of section 42–4–108(2) and (3)." *Id.* Section 42–4–108(2) provides in pertinent part that a:

> driver of an authorized emergency vehicle, . . . when in pursuit of an actual or suspected violator of the law, . . . may . . . (a) [p]ark or stand, . . . (b) [p]roceed past a red or stop signal or stop sign, . . . (c) [e]xceed . . . lawful speeds . . . so long as

---

makes some other overt action designed to avoid apprehension.
Trial Ex. 6, (R. I at 131).

**3.** Officer McAleer explained during the hearing that the "wigwags" are only visible from a vantage point behind the police vehicle.

said driver does not endanger life or property ... [and] (d) [d]isregard regulations governing directions of movement or turning in specified directions.

Section 42–4–108(3) dictates that these exemptions "apply to section 24–10–106(1)(a), C.R.S., only when such vehicle is making use of audible or visual signals meeting the requirements of section 42–4–213" (the "lights and siren requirement"). There is an exception to this requirement, however, which states that "an authorized emergency vehicle being operated as a police vehicle while in actual pursuit of a suspected violator of any provision of [title 42] need not display or make use of audible or visual signals so long as such pursuit is being made to obtain verification of or evidence of the guilt of the suspected violator." *Id.*[4]

The net effect of these statutes is that a governmental entity is generally immune from tort liability in connection with the operation of an emergency vehicle. However, the vehicle must be operating with emergency lights and siren activated, unless the vehicle is in pursuit of a suspected violator to obtain evidence of guilt.

In this case, there is no dispute that Officer McAleer failed to activate his lights and siren. For purposes of the *Trinity* issues, there is also no real dispute that Officer McAleer was exceeding the lawful speed limit and otherwise disregarding normal traffic regulations. Thus, the City's immunity from suit turns on whether Officer McAleer was indeed engaged in a "pursuit" of the Oldsmobile as contemplated by section 42–4–108(3) and whether, if he was engaged in a "pursuit," the pursuit was made to "obtain verification of or evidence of" the other driver's guilt pursuant to the statute.

### 2. Standard of Review

■ Whether governmental immunity applies to bar a suit is a question of jurisdiction for the trial court. *Springer v. City and County of Denver,* 13 P.3d 794, 798 (Colo. 2000). As a result, "if raised before trial, the issue is properly addressed pursuant to a

C.R.C.P. 12(b)(1) motion to dismiss." *Corsentino v. Cordova,* 4 P.3d 1082, 1087 (Colo. 2000). Where "the jurisdictional issue involves a factual dispute, a reviewing court employs the clearly erroneous standard of review to the trial court's findings." *Springer,* 13 P.3d at 798. Where, however, the facts are undisputed and the issue is one of law, the appellate court reviews the trial court's jurisdictional ruling de novo. *Id.*

■ In this case, the trial court ruled on only one of the questions of law: concluding there was no pursuit. To the contrary, the court of appeals concluded there was a pursuit, but that it was for purposes of "verification." Since matters of statutory interpretation are matters of law, we review both of these rulings de novo. *Fogg v. Macaluso,* 892 P.2d 271, 273 (Colo.1995).

### 3. Interpretive Principles and the GIA

■ "Because the GIA's immunity derogates Colorado's common law, legislative grants of immunity must be strictly construed." *Corsentino,* 4 P.3d at 1086. Accordingly, "we construe the GIA provisions that withhold immunity broadly [and] we construe the exceptions to these waivers strictly." *Id.* (internal citations omitted); *Springer,* 13 P.3d at 798.

■ As with all matters of statutory construction, in construing the GIA, including its waivers, we must give effect to the legislature's intent. *Springer,* 13 P.3d at 799. To accomplish that task, "[w]e look to the language of the statute, giving words their plain and ordinary meaning." *Id.* And, "[i]f the plain language of the statute demonstrates a clear legislative intent, we look no further in conducting our analysis." *Id.* Because the exception at issue in this case would abrogate a common law remedy otherwise available to Tidwell, we cannot construe it in a way that would grant the City immunity absent a clear expression of legislative intent. *Beach v. Beach,* 74 P.3d 1, 4 (Colo. 2003).

---

4. For reasons only of economy, we refer to this exception throughout the opinion as the "verification" exception or clause.

#### 4. Pursuit

With these interpretive principles in mind, we, for the first time, construe the term "pursuit" as well as the verification exception to the lights and siren requirement.

■ As the court of appeals correctly noted, "neither the GIA nor Title 42 defines 'pursuit.'" *Tidwell*, 62 P.3d at 1023. Accordingly, we must give this term its plain and ordinary meaning. "A strained or forced construction of a statutory term is to be avoided, and we must look to the context of a statutory term." *Fogg*, 892 P.2d at 274. We agree with the court of appeals that the appropriate source from which to glean the plain and ordinary meaning of pursuit is from the dictionary and not the Denver Police Manual. *See id.* (endorsing the dictionary definition for the term "emergency" for purposes of the GIA). As the court of appeals pointed out, "if the meaning of 'pursuit' were based on a governmental entity's definition of the term, there could be conflicting definitions of the term throughout the state." *Tidwell*, 62 P.3d at 1023.

Further, the Police Manual definition to which the trial court refers presents an additional problem under section 42–4–108. Specifically, the Police Manual defines "pursuit" by a determination of whether the officer has given a "visual and audible signal" to a driver. Because 42–4–108 requires "audible or visual signals" whenever there is a "pursuit," the Police Manual's definition could be tautological.

Webster's New World College Dictionary 1166 (4th ed.1999) defines to "pursue" as 1) "to follow in order to overtake, capture, or kill; chase," and 2) "to proceed along, follow or continue with a specified course, action, plan, etc.," and 3) "to try to find, get, win, etc.; strive for; seek after." Similarly, Black's Law Dictionary 1250 (7th ed.1999) defines "pursuit" as "[t]he act of chasing to overtake or apprehend."

■ Once we focus on the dictionary definitions, we quickly conclude that Officer McAleer was engaged in a "pursuit" as that term is ordinarily understood. Here, the driver of the Oldsmobile fled the scene of the initial stop in a clear attempt to avoid arrest or further investigation. According to his own admission, Officer McAleer hurriedly followed the driver in order to apprehend him. Accordingly, Officer McAleer was engaged in a "pursuit" for purposes of 42–4–108. Thus, we agree with the court of appeals that the trial court erred in ruling that there was no "pursuit" in this case.

#### 5. The "Verification" Clause

Next, we apply the above interpretive rules to construe the verification exception to the lights and siren requirement. As the court of appeals stated, "no Colorado appellate opinion has interpreted this exception." *Tidwell*, 62 P.3d at 1022. In its decision, the court of appeals held that Officer McAleer was not required in this instance to activate his lights and siren since he was conducting an investigation as provided under section 42–4–108(3).

Specifically, the court of appeals explained that since the initial purpose of Officer McAleer's stop was investigatory in nature (he had no intent or probable cause to arrest anyone in the car at that point), this purpose continued to operate even as he pursued the fleeing Oldsmobile since, it explained, "nothing in § 42–4–108(3) ... limits [this] exception to verifications while the officer is moving." *Id.* at 1023. On appeal to this court, the City argues further that even though Officer McAleer had probable cause to stop and arrest the driver of the Oldsmobile for a Title 42 violation (careless driving), as required by the statute, the verification clause applied because Officer McAleer was without evidence of auto theft, also a Title 42 violation. Thus, they argue, despite the existence of probable cause to stop a driver for one violation, whenever the officer still needs to verify any other Title 42 violation, that officer need not activate lights and siren. We disagree.

■ Because statutory terms must be "construed in harmony with one another so as to give full effect to the legislative intent in enacting the statute," we must look at section 42–4–108 as a whole in order to interpret the plain and ordinary meaning of the verification clause. *Fogg*, 892 P.2d at 274.

Indeed, "consideration of an undefined term in context may provide guidance as to legislative intent and the term's proper meaning." *Id.* Looking at section 42–4–108 as a whole, it is clear that in enacting this statute, the General Assembly meant to balance the needs of law enforcement and other emergency service providers with the safety concerns of non-governmental drivers on Colorado roads.

In context, it appears that the purpose of the lights and siren requirement is to ensure that operators of emergency vehicles give due regard to the safety of other drivers on the road. It is not, as the City contends, a mere request to stop or pull over. Language found in subsection (4) of the statute indicates the legislature's concern.

Subsection (4) of section 42–4–108 provides that "[t]he provisions of this section shall not relieve that driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of such driver's reckless disregard for the safety of others." This statute, including the exact language found in subsection (4), has existed since it was first passed in 1957 (well before the passage of the GIA in 1971), when it was then codified as section 13–4–4, C.R.S. (1957). The verification clause has also existed in the same form since 1957. § 13–4–4(2).

While undoubtedly one of the purposes of a police vehicle's audible and visual signals is to order a pursued vehicle to stop, another purpose is to make other drivers aware of the pursuit so they may alter their conduct accordingly. This is seen by the explicit incorporation of section 42–4–213, 11 C.R.S. (2003) within subsection (3) of 42–4–108 (the verification exception). Section 42–4–108(3) states that emergency vehicles can violate normal traffic regulations[5] provided they use audible or visual signals as required by section 42–4–213. Section 42–4–213(1) requires all emergency vehicles to be equipped with a siren "capable of emitting a sound audible under normal conditions from a distance of not less than five hundred feet." Sections 42–4–213(2) and (3) permit, but do not require, a police vehicle to have mounted signal lamps with "sufficient intensity to be visible at five hundred feet in normal sunlight." Subsection (5) states that "[t]he use of either the audible or the visual signal equipment described in this section shall impose upon *drivers of other vehicles* the obligation to yield right-of-way *and* stop as prescribed in section 42–4–705" (a police stop). § 42–4–213(5) (emphasis added). Thus, reading 42–4–108 and 42–4–213 together as the legislature explicitly intended, it is clear that a police vehicle in pursuit of a driver suspected of violating Title 42 must activate its lights and siren in order to alert the suspect to stop as well as to warn other drivers of the ongoing pursuit.

■ In interpreting the verification exception to the lights siren requirement, as well as any other statute, "we must strive to give consistent, harmonious, and sensible effect to all of its parts." *City of Grand Junction v. Sisneros,* 957 P.2d 1026, 1028 (Colo. 1998).

■ In order to interpret the exception in harmony with the entire statute, we construe the verification exception merely to permit a reasonably safe pursuit of a suspect, without lights and siren, only where the officer is trying to confirm his suspicions that the driver has violated Title 42 and where the officer otherwise has no reasonable suspicion or probable cause to stop the driver of the vehicle. We note here that a police officer must have some individualized suspicion that the driver has broken the law before the officer may use the lights or siren to stop the vehicle. *See People v. Taylor,* 41 P.3d 681, 686–87 (Colo.2002) (holding that the "flashing lights and blaring sirens of a police vehicle" implicate the Fourth Amendment's search and seizure requirements). The statute recognizes that Fourth Amendment protection by allowing an officer to pursue a vehicle to obtain that individualized evidence, without activating emergency signals.

5. *See City of Grand Junction v. Sisneros,* 957 P.2d 1026, 1029 n. 4 (Colo.1998) (indicating that a police vehicle is immunized for a broader range of conduct than merely what is enumerated in 42–4–108(2)).

We believe that this construction achieves the goal of section 42–4–108, which is to maintain a balance between the needs of law enforcement in pursuing a suspect and the safety of drivers on public roads.

In this case, Officer McAleer testified both that he already had authority to stop and arrest the driver of the Oldsmobile and that he was pursuing the driver for this reason. Specifically, he explained that by the time the Oldsmobile fled the scene at 23rd and Dahlia, he had probable cause to stop the driver because of his careless driving. Further, he was hoping to "recontact" the car to confirm whether the car was indeed stolen. Officer McAleer testified at the *Trinity* hearing that, in his opinion, the emergency signals were not necessary since he was not in "pursuit" of the Oldsmobile, because he was not one or two car lengths behind it. Parenthetically, then, even if we were to accept the Citys interpretation of the verification exception, there are no facts in this case that would trigger its application. Yet, the City insists that since Officer McAleer was not certain about the car theft, he should have been permitted to violate traffic laws and drive in an unsafe manner in pursuit of the speeding Oldsmobile by virtue of the fact that at least one of the reasons for the pursuit was not supported by probable cause.

Not only does this interpretation violate the clear intent of the lights and siren requirement, it misreads the plain meaning of the exception. The exception states that a police vehicle "while in actual pursuit of a suspected violator ... need not display or make use of [its] signals *so long as* such pursuit is being made to obtain verification of or evidence of the guilt of the suspected violator." 42–4–108(3) (emphasis added). This would indicate that the exception is intended to cover those pursuits solely made for investigation, where the officer lacks the requisite suspicion to stop the suspect. Where an officer already has probable cause to stop a driver and the officer is pursuing the driver for that reason, the statute contemplates the use of emergency signals.

## IV. Summary Judgment

Finally, we must address the propriety of the trial court's entry of summary judgment in favor of the City. At the time of the *Trinity* hearing, there was no pending Motion for Summary Judgment filed by the City on the issue of causation of the accident. The City had filed a summary judgment motion averring that there were no facts to support a conclusion that Officer McAleer owed a tort-based duty to prevent a third-party from harming Tidwell. While this argument could relate to the ultimate question of whether it was Officer McAleer or the driver of the Oldsmobile that caused the accident in the legal and proximate causation sense, the Motion focused on the existence of a duty.

Specifically, the City agreed that Officer McAleer would have owed a duty to prevent a third-party from harming Tidwell, but only if a "special relationship" existed between Officer McAleer and the driver of the Oldsmobile. Citing to *Davenport v. Comty. Corrections of Pikes Peak Region, Inc.,* 962 P.2d 963, 968 (Colo.1998), the City explained that a special relationship exists where the actor has control over the third-party. The City even conceded that because of the level of control involved, a special relationship does exist between an officer and a third-party where the officer is chasing the third-party. However, the City contended that no such relationship existed between Officer McAleer and the driver of the Oldsmobile since Officer McAleer never chased the driver of the Oldsmobile, and thus never forced the driver to flee.

Following its determination that Officer McAleer was not in "pursuit" of the Oldsmobile, and that, therefore, the City was protected by governmental immunity, the trial court turned to a consideration of summary judgment. At that point, the trial court reframed the summary judgment question as one of causation rather then duty. It then entered summary judgment in favor of the City from the bench since "nothing Officer McAleer did at the time of this incident was a cause of the accident."

Initially, the trial court did not intend to address the causation issues and had, indeed, precluded the plaintiff from introducing the deposition of an expert witness who reported that through various sources, he was certain

that the driver of the Oldsmobile knew he was being followed by Officer McAleer. Tidwell also tried to examine another expert witness who would have inferred that, had the siren been activated, the limousine might have slowed down, avoiding the collision altogether. Tidwell was rebuffed, however, when the trial court prohibited the testimony, explaining that anything relating to cause was "irrelevant" to the issue of whether there was a pursuit.

Only at the conclusion of the evidentiary hearing did the trial court return to the causation question, and, in passing, entered findings and ultimately a conclusion resulting in summary judgment for the City.

We now reverse the trial court's entry of summary judgment for the City on the issue of causation. Causation was an appropriate inquiry, to a limited extent, as related to governmental immunity. However, the trial court both limited the plaintiff's opportunity to obtain and present evidence on that point, and then exceeded the scope of the governmental immunity analysis in its entry of summary judgment.

We have previously stated that the issue of state immunity under the GIA is a question of subject matter jurisdiction and must, therefore, be determined according to C.R.C.P. 12(b)(1). *Trinity Broadcasting,* 848 P.2d at 924; *Medina v. State,* 35 P.3d 443, 451–52 (Colo.2001). We have also stated that under C.R.C.P. 12(b)(1), the plaintiff bears the burden of proving that the court has subject matter jurisdiction to hear the case. We imposed this burden on the plaintiff in *Trinity Broadcasting* after noting that federal courts also require the plaintiff to prove jurisdiction under the analogous federal rule. *Trinity Broadcasting,* 848 P.2d at 925. While we have consistently imposed this burden upon the plaintiff in cases involving the GIA, we have not clarified how a plaintiff is to meet that burden.

In engaging in that analysis here, we first observe that although federal courts' interpretation of its rules and statutes can be an aid in construing analogous Colorado rules and statutes, an attack on the subject matter jurisdiction of a federal court is not analogous to an attack on jurisdiction of a state court. Accordingly, federal precedent may have little impact in this arena.

For example, in *Penteco Corp. v. Union Gas System, Inc.,* 929 F.2d 1519, 1521 (10th Cir.1991) the Tenth Circuit explained that "[s]ince federal courts are courts of limited jurisdiction, there is a presumption against [their] jurisdiction, and the party invoking federal jurisdiction bears the burden of proof." Accordingly, federal courts afford no presumptions to the plaintiff's jurisdictional allegations in deciding subject matter jurisdiction. *Holt v. U.S.,* 46 F.3d 1000, 1003 (10th Cir.1995). The determination can be made on the face of the complaint, or after a limited inquiry. *Penteco Corp.,* 929 F.2d at 1521; *Holt,* 46 F.3d at 1003 (explaining that "[t]he jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case").

There is no similar presumption against jurisdiction in Colorado state courts. Rather, we are courts of general jurisdiction, with a mandate to construe our rules liberally to "secure the just, speedy, and inexpensive determination of every action." C.R.C.P. (1)(a).

A motion to dismiss for lack of subject matter jurisdiction is a motion designed to dispose of cases without requisite jurisdiction at an early stage in the proceedings. In the context of a claim against a governmental entity, before allowing the case to proceed on its merits, a trial court must determine whether the plaintiff has satisfied the jurisdictional prerequisites of the statute.

In this vein, we now hold that where a plaintiff has sued a governmental entity and that entity interposes a motion to dismiss for lack of jurisdiction, the plaintiff has the burden of demonstrating that governmental immunity has been waived. However, because there is no presumption against state court jurisdiction and because we must construe statutes that grant governmental immunity narrowly, we also hold that the plaintiff should be afforded the reasonable inferences of his evidence. When the alleged jurisdictional facts are in dispute, the

trial court should conduct an evidentiary hearing and enter findings of fact. When there is no evidentiary dispute, the trial court may rule without a hearing. *Padilla ex rel. Padilla v. Sch. Dist. No. 1*, 25 P.3d 1176, 1180 (Colo.2001). We restate our direction to the trial court to allow the parties latitude in discovering or introducing evidence tending to prove or disprove jurisdiction if necessary to the ultimate determination. *Trinity Broadcasting*, 848 P.2d at 924.

Although the burden falls upon the plaintiff, the burden is a relatively lenient one. In many GIA cases, the question of jurisdiction turns on whether the plaintiff gave timely and appropriate notice of the claim as required by the statute. *See, e.g., id.; see also Gallagher v. Bd. of Trs.*, 54 P.3d 386, 389 (Colo.2002). Such evidentiary determinations are far simpler than the evidentiary determination required of the trial court in this case. Here, the question presented to the trial court encroached upon the merits of the case. In response to the 12(b)(1) motion in this case, Tidwell was required to demonstrate that he could satisfy the jurisdictional prerequisites found in the GIA. Specifically, under subsection (1) of 24-10-106, he was required to offer evidence proving that he suffered from "injuries resulting from" conduct enumerated by subparts (a) through (f).

The phrase "resulting from" clearly requires some relationship between a plaintiffs injuries and the public entitys conduct before a waiver of immunity is triggered. However, nothing in our previous cases or the statute requires a plaintiff to show that his injuries were "caused by" the public entity's conduct in the tort sense.

Consistent with the principles guiding our interpretation of "pursuit", we interpret the statutorily undefined phrase "resulting from" both to give effect to legislative intent and to interpret a term that waives immunity broadly. To effectuate the legislature's intent, we look both to the commonly accepted meaning of the phrase as well as statutory context. *Fogg*, 892 P.2d at 274. Webster's New World Dictionary (4th ed.1999) defines to "result" as "to happen or issue as a consequence or effect: often with *from*." Further, section 24-10-106, viewed as a whole, demonstrates a distinction between the phrase "caused by" and "resulting from." For in-

stance, subpart (d)(II) waives immunity for injuries resulting from "[a] dangerous condition *caused by*" a failure to realign a stop or yield sign. Additionally, subpart (d)(III) waives immunity for injuries resulting from "[a] dangerous condition *caused by*" an accumulation of snow on public sidewalks. We make these comparisons not to construe the phrase "caused" by but only to acknowledge that the legislature had two different concepts in mind when inserting both terms in the statute. *Fogg*, 892 P.2d at 274 ("[T]erms should be construed in harmony with one another so as to give full effect to the legislative intent in enacting the statute."). Thus, we cannot treat "caused by" and "resulting from" as synonymous.

Instead, we interpret "resulting from" broadly and apply its commonly accepted meaning. Accordingly, we hold that a waiver must be found where the injuries complained of occurred as a consequence or effect of any of the public entity's alleged conduct or omissions. As we cannot interpret a term to withhold a waiver without clear legislative intent, we determine that a waiver will exist where a plaintiff alleges facts proving a minimal causal connection between the injuries and the specified conduct. Because the required showing is minimal, and because discovery by the time of the *Trinity* hearing has been limited, the trial court should afford the plaintiff the inferences of his allegations. Under this rubric, the trial court need not reach so far as to determine whether Tidwell's injuries were "caused by" Officer McAleer for purposes of the tort analysis that the finder of fact in the case would ultimately undertake. Instead, it need only decide whether Tidwell's injuries resulted from Officer McAleer's conduct in the broader sense elucidated here.

Indeed, in *Trinity Broadcasting*, we were careful to distinguish between a 12(b)(1) motion, where the court is free to weigh the evidence and determine only its "power to hear the case," and a 12(b)(5) motion, which "results in a determination on the merits at an early stage of plaintiff's case." *Trinity Broadcasting*, 848 P.2d at 925. Of course, it is the 12(b)(5) motion that the trial court can convert into a summary judgment motion on the merits when it takes matters outside the pleadings into account. *See id.* at 924.

*Trinity Broadcasting* explained that the 12(b)(1) motion, which is the appropriate focus of the *Trinity* hearing, constitutes nothing more than a "factual attack on the jurisdictional allegations of the complaint." *Id.*

Motions under 12(b)(5) that dispose of the case on a determination of the merits, including the consideration of disputed factual issues, are to be considered only after affording the plaintiff the "safeguard of having all its allegations taken as true and all inferences favorable to [the] plaintiff ... drawn." *Id.* at 925; *see also Medina,* 35 P.3d at 452.

"[S]ummary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Cary v. United Omaha Life Ins. Co.,* 68 P.3d 462, 465 (Colo. 2003). In considering a motion for summary judgment, "[t]he non-moving party is entitled to the benefit of all inferences that may be reasonably drawn from the undisputed facts, and all doubts must be resolved against the moving party." *Id.* at 465–66. Additionally, the trial court must review "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," before ruling on the motion. C.R.C.P. 56(c).

Cumulatively, then, summary judgment was clearly not appropriate on the causation issue because neither party addressed the merits of the tort analysis in the context of a dispositive summary judgment motion. Dismissal was also not appropriate on the causation issue because: 1) discovery was suspended on that issue; 2) the plaintiff was not allowed to present evidence at the hearing on that issue; and 3) the trial court did not frame the question of causation as it should have been framed for jurisdictional purposes. We also note here that the trial court need not have reached this issue given its ruling on "pursuit." However, on remand, the proper inquiry, after giving the plaintiff an opportunity to discover and present evidence on the issue, should be whether, affording all inferences to the plaintiff, the accident resulted from Officer McAleer's action or inaction.

## V. Conclusion

We conclude that the City is not entitled to the protection of governmental immunity under the provisions of the GIA that deal with pursuit by an emergency vehicle. We agree with the court of appeals that the Officer was in pursuit of the Oldsmobile, but reverse that court's conclusion that the pursuit was made pursuant to the verification exception. Rather, we determine that the verification exception did not apply, and that the Officer was required to activate his emergency signals in order to fall within the ambit of the GIA.

Because of our ruling on governmental immunity, we must also address the entry of summary judgment for the City by the trial court. We reverse that judgment as well, on the grounds that both the parties and the court appear to have inappropriately intermixed the summary judgment inquiry with the immunity inquiry. Not only did Tidwell not receive a fair opportunity to discover and present facts supporting his contention, but also the court entered summary judgment when the only causation question then extant was one to be evaluated under a dismissal standard. We therefore now reverse the court of appeals, and return this case with directions to remand it to the trial court for further proceedings.