Thomas A. CARY and Beth Hanna, individually and on behalf of their minor daughter, Dena Cary, Petitioners,

v.

UNITED OF OMAHA LIFE INSURANCE COMPANY, Respondent.

No. 04SC13.

Supreme Court of Colorado, En Banc.

Feb. 28, 2005.

Wilcox & Ogden, P.C., Ralph Ogden, M. Anne Wilcox, Denver, for Petitioners.

Kutak Rock, LLP, Gerard V. Reardon, Amy E. Arlander, Denver, for Respondent.

RICE, Justice.

Petitioner, Thomas Cary, individually and on behalf of his minor daughter, Dena Cary, appeals a judgment of the court of appeals holding that the Arvada Medical and Disability Health Care Plan unambiguously excludes Dena's injuries from coverage.

We hold that the Plan is ambiguous because it is susceptible to more than one reasonable interpretation. Therefore, we reverse the court of appeals' holding and remand with instructions to return the case to the trial court for proceedings consistent with this opinion.

## I. Facts and Procedural History

Petitioner was an employee of the City of Arvada, which provided him and his fourteen-year-old daughter, Dena, with health coverage under the Arvada Medical and Disability Health Care Plan (Plan), a partially self-funded municipal health plan overseen by the Arvada Medical and Disability Trust Fund (Trust). Like all Arvada employees, Petitioner did not receive a copy of the Plan itself. Rather, in February 1994, Arvada distributed a summary plan description (1994 SPD), which highlighted relevant aspects of the Plan.

In 1996, the Trust retained Respondent, United of Omaha Life Insurance Company (United), to administer the Plan. United was responsible for handling and processing all claims, and for determining the extent of coverage. United's determinations were appealable to the Trust. Mutual of Omaha of Colorado, Inc. (Antero) sub-contracted with United to fulfill some of United's claims investigations and appeals responsibilities.

In November 1996, Arvada distributed a flier entitled "Mutual [of] Omaha Companies Point–of–Service Plan Summary" (1996 Flier) that summarized benefits and listed general exclusions from the Plan. In or around July 1997, Arvada distributed a new summary plan description to its employees (1997 SPD) which stated that it was effective January 1, 1997. Both the 1996 Flier and the 1997 SPD contained markedly different exclusions than the 1994 SPD.

In June 1997, Dena shot herself under the chin in an unsuccessful suicide attempt. At the time, she was suffering from a major depressive episode associated with diagnosed bipolar disorder, a biologically based mental illness covered by the Plan. Dena's gunshot injuries required extensive treatment, hospitalization, and multiple surgeries.

Petitioner and Dena (Insureds) applied for benefits under the Plan, but United denied the claim. After an unsuccessful appeal to the Trust, Insureds brought suit in Denver District Court (trial court) against Arvada, the Trust, United, and Antero[1] seeking a declaration that the Plan covered Dena's injuries, as well as damages for breach of insurance contract and bad faith failure to provide insurance benefits.

On cross motions for summary judgment, the trial court held that the Plan's definitions and exclusionary provisions were ambiguous, and resolved the ambiguity in favor of coverage. Additionally, the trial court dismissed Insured's bad faith claim with prejudice, holding that claims of insurance bad faith against third-party administrators are limited to the workers' compensation arena.

Insureds appealed summary judgment on their claim of insurance bad faith, and United cross-appealed summary judgment on the issue of coverage. In *Cary v. United of Omaha Life Insurance Co.*, 43 P.3d 655, 659 (Colo.App.2001) (*Cary I*), the court of appeals affirmed the trial court's grant of summary judgment on Insureds' bad faith claim. Having determined that judgment for United was proper, the court of appeals did not address United's cross-appeal. *Id.* at 660.

In *Cary v. United of Omaha Life Insurance Co.*, 68 P.3d 462, 464 (Colo.2003) (*Cary II*), we reversed the trial court's determination that United owed no duty of good faith when investigating and servicing insurance claims under the Plan. We concluded that United "had primary control over benefit determinations, assumed some of the insurance risk of loss, undertook many of the obligations and risks of an insurer, and had the power, motive, and opportunity to act unscrupulously in the investigation and servicing of the insurance claims." *Id.* at 463. Accordingly, we held that a special relationship existed between United and Insureds that was sufficient to establish United's duty to act in good faith. *Id.* Consequently, we reinstated Insureds' bad faith claim against

---

1. Arvada and the Trust settled immediately after the trial court decision. Antero settled after we issued our opinion in *Cary v. United of Omaha Life Insurance Co.*, 68 P.3d 462 (Colo.2003) (*Cary II*), but before the court of appeals' decision in *Cary v. United of Omaha Life Insurance Co.*, 91

P.3d 425 (Colo.App.2003) (*Cary III*). Thus, United is the sole party remaining in this case. The issue of coverage is central to Insureds' claim of bad faith failure to provide insurance benefits.

United and remanded the issue of coverage to the court of appeals. *Id.*

On remand, the court of appeals reversed the trial court's grant of summary judgment on the issue of coverage, holding that the Plan unambiguously excluded coverage for Dena's injuries. *Cary v. United of Omaha Life Ins. Co.,* 91 P.3d 425, 428, 430 (Colo.App. 2003) (*Cary III* ). This appeal followed.

We accepted certiorari to determine (1) whether the court of appeals correctly held that the Plan unambiguously excluded coverage for Dena's injuries, and (2) if so, whether the 1994 SPD created an ambiguity that the 1996 Flier and 1997 SPD later cured.[2]

Because the Plan is susceptible on its face to more than one reasonable interpretation, we hold that the Plan is ambiguous and resolve the ambiguity in favor of coverage. We therefore reverse and remand to the court of appeals with instructions to return it to the trial court for proceedings consistent with this opinion.

## II. Analysis

■■■■ An insurance policy is a contract, the interpretation of which is a matter of law that we review de novo. *State Farm Mut. Auto. Ins. Co. v. Stein,* 940 P.2d 384, 387 (Colo.1997); *Union Ins. Co. v. Houtz,* 883 P.2d 1057, 1061 (Colo.1994). As with any contract, we construe the terms of an insurance policy to promote the intent of the parties. *Houtz,* 883 P.2d at 1061.

2. We granted certiorari on the following issues:

1) Whether the court of appeals correctly interpreted Tom Cary's health insurance plan as excluding coverage for injuries sustained by his fourteen year old daughter when she shot herself because she was suffering from a biologically based major depressive episode.
2) Whether a brochure or the draft of a new Summary Plan Description which purports to exclude coverage can trump a previously published and distributed Summary Plan Description which contains no such exclusion even though the draft Summary Plan Description had not been distributed to insureds.

3. Capitalization of words and phrases in quoted Plan material indicates that such words and

■■■■ We must enforce an insurance policy as written unless the policy language contains an ambiguity. *Stein,* 940 P.2d at 387. An insurance policy is ambiguous if it is susceptible on its face to more than one reasonable interpretation. *Houtz,* 883 P.2d at 1061. Any ambiguity in an insurance policy is construed in favor of providing coverage to the insured. *Am. Fam. Mut. Ins. Co. v. Johnson,* 816 P.2d 952, 953 (Colo.1991). A mere disagreement between the parties concerning interpretation of the policy does not create an ambiguity. *Houtz,* 883 P.2d at 1061. To determine whether a policy contains an ambiguity, we must evaluate the policy as a whole. *Id.; Stein,* 940 P.2d at 387.

In this case, the Plan provides that it pays a specified percentage of "covered expenses" per year. To qualify as a "covered expense," a medical expense must be "Medically Necessary for the treatment of an Injury or an Illness not specifically excluded or otherwise limited under [the] Plan."[3]

The Plan defines "injury" and "illness" as follows:

*Injury.* Injury means accidental bodily Injury which occurs independently of Illness. Injury does not include self-inflicted bodily Injury, either while sane or insane,[4] or disease or infection (except pyogenic infection occurring through an accidental cut or wound).

*Illness.* Illness means a physical or mental disorder, including pregnancy.

phrases are expressly defined in the Definitions section of the Plan. Only Plan definitions that are relevant to the analysis in this case are included in this opinion.

4. Citing *Bigelow v. Berkshire Life Insurance Co.,* 93 U.S. 284, 287, 23 L.Ed. 918 (1876), United argues that the "sane or insane" language contained in the Plan is meant to exclude benefits for self-destructive behavior regardless of the degree or nature of the mental disorder from which the individual is suffering. However, *Bigelow* is distinguishable on its facts because it involved a life insurance policy whose exclusion prohibited coverage where the decedent "shall die by suicide (sane or insane)." *Id.* at 285–86. Here, there is no mention of the term "suicide" in the Plan and it is not apparent that the Plan's exclusion for self-inflicted injuries means attempted suicide.

These definitions are controlling throughout the Plan.

■ The Plan also contains an exclusionary provision which provides that "[c]harges in connection with a self-inflicted injury, whether sane or insane" are not covered. However, because the Plan definitions are controlling throughout the Plan, this provision cannot be read in isolation, but must be read in context with the specific definitions set forth in the Plan. Accordingly, this exclusionary provision only applies to "injury" as the Plan defines that term.

United argues that the Plan language clearly and unambiguously excludes self-inflicted injuries from coverage. Insureds agree with United that this is one reasonable interpretation of the Plan. However, Insureds argue that an equally reasonable interpretation of the Plan is that if a self-inflicted injury results from an illness, treatment for that injury is covered. We agree that each interpretation is reasonable.

One reasonable interpretation of these definitions is that the first sentence in the "injury" definition ("Injury means accidental bodily Injury which occurs independently of Illness") is a definitional sentence that narrows the effect of the limitation contained in the second sentence ("Injury does not include self-inflicted bodily Injury, either while sane or insane"). Thus, the self-inflicted injury limitation in the second sentence of the "injury" definition modifies only the phrase "accidental bodily Injury which occurs independently of Illness." As a result, injuries

that occur as a result of illness, even if self-inflicted, are defined out of the "injury" definition and are covered by the Plan's promise to provide coverage for treatment of an illness.

The trial court illustrated this interpretation of the language by comparing a self-inflicted injury resulting from a drunken dare with a self-inflicted injury resulting from narcolepsy. Because a drunken person does not suffer from a covered illness, the Plan does not cover self-inflicted injuries resulting from drunken behavior. Conversely, because narcolepsy is a covered illness, self-inflicted injuries resulting from a narcoleptic fall down the stairs would be covered as "Medically Necessary for the treatment of an Illness." Similarly, because Dena's bipolar disorder is a covered illness, self-inflicted injuries resulting from her bipolar disorder would be covered as well.[5]

However, an equally reasonable interpretation is that both sentences in the "injury" definition are of like definitional value, that is to say that one does not modify the other. Thus, to be covered, an injury must be "accidental bodily Injury which occurs independently of Illness" and must not be "self-inflicted bodily Injury, either while sane or insane." Accordingly, if an injury is accidental or is the result of an illness, it nonetheless would be excluded from coverage if it is self-inflicted. Likewise, though the result of her bipolar disorder, Dena's injuries would be excluded because they were self-inflicted.

5. United argues that although the Plan provides coverage for treatment of the mental illness itself, it does not cover all the consequences that might flow from the mental illness. Thus, United argues that although depression may be a symptom of Dena's bipolar disorder, her injuries are not themselves a symptom of bipolar disorder and are not covered in the treatment of her mental illness. In other words, United argues that the sequela of a symptom can be isolated from the symptom itself, and that the symptom is covered, but the sequela is not. This argument is without merit.

Bipolar disorder is a biologically based mental illness that is a disease or illness in the same sense as cancer, diabetes, or heart disease. See, e.g. § 10–16–104(5.5), C.R.S. (2004) ("Every group policy, plan certificate, and contract of a carrier subject to the provisions of ... this article ... shall provide coverage for the treatment of

biologically based mental illness that is no less extensive than the coverage provided for any other physical illness."). It is well established that physically self-destructive behavior, including attempted suicide, is a symptom of bipolar disorder. American Psychiatric Association, *Diagnostic and Statistic Manual of Mental Disorders* 320, 322 (4th ed.1994). Thus, Dena's injuries are physical manifestations of a symptom of her mental illness. Arguing that Dena's injuries are not covered is tantamount to arguing that coverage is available for treatment of diabetes, but not the consequences of high blood sugar, which is a symptom of diabetes. Not only is this argument contrary to the concept of health care, it is inconsistent with Insureds' reasonable interpretation of the Plan, namely that the "injury" definition defines injuries occurring as a result of illness out of the definition of "injury" and into the definition of "illness."

Both interpretations are equally reasonable, but problematic. The first interpretation is problematic because it presumes that injuries occurring as a result of an illness, though expressly excluded from coverage under the "injury" definition, are covered by default under the "illness" definition. The second interpretation is problematic because it completely reads "which occurs independently of Illness" out of the "injury" definition. Most importantly for our purposes, however, the Plan is ambiguous because it is susceptible to each equally reasonable interpretation.

The Plan is also ambiguous because the second sentence in the "injury" definition references "self-inflicted bodily injury" without more. The term "injury" is defined generally as "accidental bodily injury." Many injuries are accidentally self-inflicted, such as cutting one's finger while chopping vegetables or falling while skiing. It is unclear from the Plan language whether these injuries are covered or excluded under the Plan. Rather, the Plan is susceptible to two equally reasonable interpretations because accidental self-inflicted injuries are within the definition of injury and also within the self-inflicted injury exclusion.[6] Because we resolve ambiguities in favor of coverage, Dena's injuries are covered.

Based on our conclusion that the Plan is ambiguous, we need not address whether or not the 1994 SPD created an ambiguity that the 1996 Flier and 1997 SPD later cured.[7]

We therefore reverse and remand to the court of appeals with instructions to return this case to the trial court for proceedings consistent with this opinion.

Justice KOURLIS dissents and Justice BENDER joins in the dissent.

Justice COATS dissents.

KOURLIS, J., dissenting.

Because I believe that the language of the Arvada Medical and Disability Health Care Plan (the "Plan") unambiguously states the Plan's intent to preclude self-inflicted bodily injuries from coverage, I agree with the court of appeals that the claimant's injury, sustained as a result of an unsuccessful suicide attempt, is not covered. Moreover, I believe that by its express statement, coverage for self-inflicted injuries is precluded whether the claimant is deemed "sane or insane," in that the Plan makes clear its purpose to exclude self-inflicted bodily injuries regardless of the claimant's mental condition at the time the injury occurred. Accordingly, I disagree with the majority's assertion that the Plan is reasonably susceptible to more than one meaning. I therefore respectfully dissent.

## I. Discussion

The plaintiffs do not dispute that the injury sustained by the claimant, Dena Cary, in her unsuccessful attempt to take her own life is non-accidental and that it is a self-inflicted injury within the meaning of the contract. Their argument, which this court now endorses, is that the policy language does not unambiguously manifest the Plan's intent to preclude self-inflicted injuries of a suicidal claimant, reasoning that the policy language is amenable to more than one construction.

6. In a related argument, Insureds argue that the Plan is also ambiguous because it does not state whether the self-inflicted injury exclusions require the injury to have been intentionally self-inflicted. If the self-inflicted injury exclusions require the injury to have been intentional, Insureds argue that this only aggravates the ambiguity in the Plan because the word "intentionally" has more than one meaning. Insureds further argue that the phrase "whether sane or insane" fails to clarify this ambiguity. Because we conclude that the ambiguity in the Plan arises solely as a result of the effect of the first two sentences in the definition of "injury," and because an analysis of the intentional/accidental and sane/insane dualities has no effect upon our

finding of ambiguity, we do not address either of these arguments.

7. Each of these documents ultimately defers to the Plan if there is a conflict. The 1994 SPD provides that "[i]n any cases of conflict, the official Plan document will determine your eligibility or benefit." Similarly, the 1997 SPD expressly provides that "[i]n the event of any inconsistencies between the [P]lan documents and the summary plan description, the [P]lan documents will govern." For full details on coverage, the 1996 Flier instructs Insureds to "refer to the plan document [they] will receive after enrollment."

To ascertain the outer limits of coverage, it is axiomatic that we must examine the policy language, giving effect to the plain and ordinary meaning of the terms. *Fox v. 1–10, Ltd.*, 957 P.2d 1018, 1022 (Colo.1998); *State Farm Mut. Aut. Ins. Co. v. Stein*, 940 P.2d 384, 387 (Colo.1997); *Wota v. Blue Cross and Blue Shield*, 831 P.2d 1307, 1309 (Colo.1992); *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 17 (Colo.1990). Our task is to "examine and construe the policy in harmony with the plain, popular, and generally accepted meaning of the words employed and with reference to all provisions of the document." *Wota*, 831 P.2d at 1309.

In addition, two basic rules of contract interpretation control issues of policy ambiguity. On the one hand, we have stated that policy ambiguities must be construed in the insured's favor. *See, e.g., Am. Fam. Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo. 1991). At the same time, we have stressed that policy provisions should be read to avoid ambiguities if possible, declaring: "[T]he language should not be tortured to create ambiguities." *Wota*, 831 P.2d at 1309. These are not conflicting propositions. Together, they embody the guiding fundamental principle of contract interpretation that while ambiguities are reconciled in the insured's favor, courts may not invent ambiguity and have "no warrant to stretch language, through strained construction, to find against the insurer." *See* 17 Richard A. Lord, *Williston on Contracts* § 49:111, at 25 (4th ed. 2000 & Supp. 2004).

In my view, the application of these established principles to the terms of the policy at issue clearly leads to the conclusion that the Plan excludes coverage for self-inflicted bodily injuries. By defining its coverage, and specifically and separately citing "self-inflicted injury" under the "General Limitations and Exclusions" provision, the policy language dictates that such injury be excluded from coverage. The trial court agreed with this particular conclusion, noting that through the "limitations and exclusions" section, "the Plan appears to clearly and unambiguously exclude self-inflicted injuries of the kind at issue in this case." The trial court did not end its analysis here, as I would; but

rather, the trial court determined, by reason of its reading of the Plan's definitional section, that the contract was ambiguous.

I find no such ambiguity. In my view, consistent with its exclusion provision, the policy's definitional section also precludes the claimant's self-inflicted injury from coverage. Here once again, we are reminded of rules of contract interpretation when assessing the meaning of terms specified in the policy's definitional section. Where the insurance contract itself defines a term as used in the policy, the court gives the term its agreed upon meaning. Lord, *supra*, § 49:14, at 79. Moreover, we have emphasized that the meaning of policy terms must be determined by examining the entire instrument, and not by viewing clauses or phrases in isolation. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo.2002). Of course, we are always guided by overriding rules of contract interpretation requiring us to honor and apply the plain meaning of words used in the contract.

Two specific terms are at the center of the dispute: "injury" and "illness." The definition of "injury" in the policy is simple— "*accidental bodily injury* which occurs independently of illness," excluding "*self-inflicted bodily injury* either while *sane or insane* or disease or infection" (emphasis added). Here once again, the trial court acknowledged that by its reference to "accidental," the policy explicitly excludes the claimant's injury, because the injury was the result of an "intentional" act. Thus, viewing the policy in its entirety, the claimant's injury is excluded from coverage for two reasons: it was self-inflicted and it was the result of a non-accidental act. In essence, even if the definition of "injury" is considered ambiguous, the court need only look to the language of the coverage and exclusion provisions— specifically precluding coverage for "self-inflicted injuries." Courts may not conclude that a contract is ambiguous by isolating one term in that contract. On the contrary, all terms must be viewed in context, and the policy must be considered in its entirety. When so viewed, the policy is not ambiguous.

The trial court concluded that the policy could support more than one reading. That court opined: "[I]f a participant or beneficia-

ry incurs medical expenses as a result of an illness, those expenses are not covered as an injury[ ] because they did not occur 'independently of the illness,' but of course they may still be covered as an illness if the illness itself is otherwise covered." The majority agrees with the trial court, even adopting the court's illustration of the difference between an insured who jumps down a stairs "on a drunken dare" thereby incurring a non-covered injury, and a narcoleptic who falls down the stairs because of sudden sleepiness, incurring covered injuries. This hypothetical does not lead to the result the majority takes from it.

First, as the court of appeals points out, the policy's definition of "injury" does not purport to include the meaning of "illness," which is provided for elsewhere in the contract. Illness and injury are different, and the coverage differs for each.[1] The claimant's illness may be explicitly provided for under the scope of coverage provision—for example "mental illness."

The trial court's own illustration makes this point very clearly. First, taking the analogy of the "drunken dare," we see that injuries sustained in such a circumstance are not covered for three reasons: (1) injuries sustained by a person on a drunken dare are obviously not explicitly covered; (2) the injury falls within the exclusion because it was self-inflicted; and (3) assuming we need go further to consider the definition of "injury," the injury was not an "accidental bodily injury." On the other hand, injuries sustained by the narcoleptic are covered because such an illness is covered by the policy.[2] This simple example illustrates the importance of examining the entire policy to determine whether particular words and phrases create ambiguities. It may be very tempting to consider words and phrases in isolation and

thereby conclude that they create an ambiguity. Such an analysis is, however, contrary to our warning that "the language should not be tortured to create ambiguities."

Applying the perceived different treatment the policy language would afford claimants in the hypothetical "drunken dare" and "narcolepsy" situation, the majority concludes that "[s]imilarly, because Dena's bipolar disorder is a covered illness, self-inflicted injuries resulting from her bipolar disorder would be covered as well." Maj. op. at 291. The majority asserts that conversely, "if an injury is accidental or is the result of an illness, it nonetheless would be excluded from coverage if it is self-inflicted;" the majority is therefore persuaded that "though the result of her bipolar disorder, Dena's injuries would be excluded because they were self-inflicted." Id. at 291 & 92, n. 6.

This argument misses the point on several levels. First, section 10–16–104(5.5), mandating coverage for "biologically based mental disorders," including major depressive disorders, was not effective at the time the policy was instated, see ch. 71 sec. 1, § 10–16–104, 1997 Colo. Sess. Laws 193. The statute is therefore inapplicable. Moreover, nowhere within the statutory provision for "biologically based mental illness" did the legislature purport to mandate that self-inflicted injury be covered. The statute only requires "coverage for the treatment of biologically based mental illness" to the same extent as other physical illness, see section 10–16–104(5.5)(a)(I), and even relieves the insurer from its obligations "to the extent that such benefits duplicate benefits required to be provided under subsection 5," governing coverage for "mental disorder," see subsection (5.5)(II)(b).

---

1. The policy also defines "injury" to preclude "disease or infection." Certainly, it cannot be said that "disease or infection" is therefore automatically precluded from coverage because it does not fall within the ambit of "injury."

2. Narcolepsy is a neurological condition characterized by an uncontrollable desire for sleep. See Webster's New World College Dictionary 8 (3d ed.1991); Charles T. Hall, Soc. Sec. Disab. Prac § 7:52 (2004) (likening narcolepsy to a seizure disorder). Injuries from narcolepsy or sudden sleepiness, as such, are accidental, not self-inflicted, and are an inherent part of the illness. An insurer who elects to cover "narcolepsy" as an illness has elected to assume the risk of resulting injuries. The insurer in this case has, however, elected to exclude "self-inflicted" or "non-accidental" injuries, regardless of the claimant's mental condition at the time of the injury—the injury in this case.

Most importantly, however, since subsection (5.5) is inapplicable, coverage of the claimant's mental illness is governed by the proviso mandating coverage for "mental illness." Here, it is undisputed that the Plan expressly provides coverage for the treatment of mental illness.

Again, isolating and emphasizing the definitional reference to "accidental bodily injury," the trial court presumed that because the insured *intentionally* shot herself, the injury falls outside the definition of "injury."[3] As noted, it is undisputed that the Plan's definition of "illness" and more precisely, its coverage provisions expressly apply to mental illness, as contained in the definition of "illness." The issue is whether the Plan unambiguously excludes treatment for self-inflicted injuries even when such injuries are the result of mental illness. On that point, the policy language is clear: "injury does not include self-inflicted bodily injury, either while *sane or insane;*" likewise, "charges in connection with a self-inflicted injury, whether sane or insane," is among the Plan's "General Limitations and Exclusions." For purpose of "sane or insane," it is irrelevant whether the claimant intended or did not intend to injure herself. In fact, the impact of the phrase "sane or insane" in a suicide clause "extends it so as to include intentional self-destruction by a sane as well as an insane person." 9 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 138:37, at 73 (3d ed. 1995 & Supp.2004); *cf.* 46 Sandra Mulay Casey, J.D., et al, *Insurance Contract and Coverage* § 712 (2005) (noting that in the United States, the majority view is that for an act to be " 'suicide, sane or insane' it is not necessary for the decedent to have realized the physical nature or consequences of his or her act"). Moreover, the policy need not specifically include the word "suicide," when the clear intent is to preclude non-accidental self-inflicted injury resulting from a suicide attempt. *See Holsinger v. New England Mut. Life Ins. Co.,* 765 F.Supp. 1279, 1282 (E.D.Mich.1991) (finding an insurance poli-

cy's reference to "self-inflicted injury" unambiguous where policy referred to "suicide or intentionally self-inflicted injury whether sane or insane"); *see also* 10 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 140:91, at 109 (3d ed. 1995 & Supp.2004) (explaining that "from the very nature of coverage keyed to an "accident," suicide, though not specifically excluded, is a limitation of the covered risk itself under an accident policy"). As such, the Plan makes clear its intent that self-inflicted injury, whether or not a result of the claimant's mental illness, is excluded from the policy provision.

Considering the Arvada Plan in total, including its range of coverage, exclusions and accompanying definitions, I disagree with the majority's conclusion that the Plan is susceptible to more than one reading. The Plan's coverage provision does not include self-inflicted injuries of a suicidal claimant; although it specifically provides for "mental illness" treatment. Moreover, the Plan expressly excludes "self-inflicted injury" from coverage—whether incurred by a claimant who is sane or insane. While isolated words and phrases of the contract might give rise to ambiguity, analysis of the entire policy refutes that conclusion.

## II. Conclusion

Because the Plan unambiguously excludes self-inflicted injuries from coverage, I disagree with the majority that the Plan is vulnerable to more than one reading. Accordingly, I respectfully dissent and would affirm the decision of the court of appeals.

I am authorized to state that JUSTICE BENDER joins in this dissent.

COATS, J., dissenting.

For the second time, this court reverses a judgment of the court of appeals that would have barred the Carys' tort claim against United of Omaha for its role in the initial denial of insurance coverage for injuries suffered by their daughter in her suicide at-

---

**3.** This court now concludes that the analysis of the "intentional/accidental and sane/insane dualities" has no effect on its finding of ambiguity, *see* maj. op. at 292, n. 6, even though both issues were at the center of the trial court decision; and the "sane or insane" phrase features prominently in the policy's exclusion of "self-inflicted injury." Maj. at 292, n. 6.

tempt. *See Cary v. United of Omaha Life Ins. Co.,* 68 P.3d 462 (Colo.2003). I dissented the first time because I disagreed with the majority's extension of tort liability, for reckless failure to comply with the terms of an insurance contract, to an entity that had no obligation under the contract. *See id.* at 469–72 (Coats, J., dissenting). I dissent this time because I find the Carys' interpretation of the contract so contrived that treating it as reasonable, as the majority does, would draw into question the meaning of virtually any insurance contract.

The majority rests its holding on the time-honored rule that ambiguity in an insurance contract must be construed in favor of the insured. However, much like the rule of lenity in the penal context, *see People v. Thoro Prods. Co.,* 70 P.3d 1188, 1198–99 (Colo.2003), this rule is a rule of last resort and applies only to ambiguity that is resistant to resolution by all other aids to construction. Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 22:16 (3d ed.1995). Insurance contracts are still contracts and are construed according to accepted aids, both intrinsic and extrinsic, to contract construction. *Thompson v. Md. Cas. Co.,* 84 P.3d 496 (Colo.2004); *Rocky Mountain Fuel Co. v. McClain,* 130 Colo. 443, 447, 276 P.2d 551, 553 (1954). We have, in the past, expressly warned against forcing an ambiguity in order to resolve it against an insurer. *See, e.g., Kane v. Royal Ins. Co. of Am.,* 768 P.2d 678, 683–84 (Colo.1989); *see also Couch on Insurance* § 21:18 ("In fact, courts are not authorized to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity, even though uncertainties and ambiguities in insurance policies are to be resolved against the insurer.").

The language of this insurance contract, excluding from coverage those injuries inflicted by the insured upon him or herself, even if he or she is insane, could not be clearer. The intent of the contract to exclude coverage of such injuries appears in both its definition of covered injuries and its enumeration of limitations and exclusions. In the former, immediately after describing covered injuries as "accidental bodily Injury which occurs independently of Illness," the contract emphasizes that "Injury does not include self-inflicted bodily Injury, either while sane or insane." In the latter, within the "general limitations and exclusions for which no benefits are payable under the provisions of this Plan," the contract expressly includes, "Charges in connection with a self-inflicted injury, whether sane or insane." No reasonably prudent person applying for an insurance contract could understand these words (as the majority would have it) to mean simply that injuries inflicted by an insane insured upon himself will still be covered, but as an "illness" rather than as an "injury."

Even if the contract as a whole were not so clear, long-accepted usage makes unmistakable that this formula was chosen specifically to exclude suicide attempts. *See Bigelow v. Berkshire Life Ins. Co.,* 93 U.S. 284, 287, 23 L.Ed. 918 (1876) (when used to exclude intended self-destruction in a life insurance policy, the words "sane or insane" have a "precise, definite, and well-understood meaning"); *see also Couch on Insurance* § 21:15 ("If the language used is ambiguous and obscure and does not in itself disclose the intent, then resort may be had to usage, surrounding circumstances existing at the time the contract was made, or other extrinsic evidence . . . ."). And even if hypothetical fact scenarios could be constructed in which it were unclear whether particular accidental injuries would be considered independent of an illness, and therefore whether they would be covered as injuries, or illnesses, or not covered at all; ambiguity at a contract's fringes or with regard to one particular set of circumstances does not render ambiguous other circumstances that are at the very core of the exclusion. *See Couch on Insurance* § 21:14 ("The fact, moreover, that terms of a policy of insurance may be construed as ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms."). The contract's exclusion for "self-inflicted" injuries plainly distinguishes acts of self-destruction from "accidental" injuries; and however ambiguous the distinction might be in some particular case, the

exclusion clearly comprehends a suicide attempt like the one in this case.

The rule of construction requiring resolution of ambiguity in insurance contracts against the insurer, when applied with restraint and as a last resort, furthers important policy goals. However, as summarized in one respected treatise on the subject, the wisdom of courts applying this "rule of liberal construction" cautions that it "does not justify the court in enlarging terms of policy beyond the clear meaning of language, and does not authorize the perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties or disregard the evidence as expressed, or to refine away terms of a contract expressed with sufficient clearness to convey the plain meaning of the parties." *Couch on Insurance* § 21:18; *see also id.* § 22:16. The danger of ignoring these admonitions looms all the larger when a given outcome seems particularly compelling.

Because I believe the terms of this insurance policy clearly exclude from coverage the treatment of self-inflicted injuries that result from suicide attempts, I respectfully dissent.