STATE OF MAINE                           BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                          CIVIL ACTION
                                         DOCKET NO. BCD-CIV-2022-00023


PRIME HOSPITALITY, INC., d/b/a        )
PRIME 25,                             )
                                      )
            Plaintiff,                )
                                      )
                                      )
       v.                             )        ORDER ON MOTION TO
                                      )        DISMISS BY DEFENDANT
                                      )        ACADIA INSURANCE
ACADIA INSURANCE COMPANY,             )        COMPANY
                                      )
            Defendant.                )


## INTRODUCTION

This case is about the scope of coverage provided by a commercial property policy of

insurance.  Plaintiff Prime Hospitality, Inc., d/b/a Prime 25 ("Prime") seeks declarations by this

Court that it is entitled to coverage under the policy of insurance issued by Defendant Acadia

Insurance Company ("Acadia") for alleged business interruption losses sustained as a result of

direct physical loss of or damage to Prime's commercial property caused by the COVID-19

pandemic and associated executive orders. Pursuant to Rule 12(b)(6) of the Maine Rules of Civil

Procedure, Acadia moves to dismiss Prime's Complaint.  For the reasons discussed below,

Acadia's motion is granted in part and denied in part.

## FACTUAL ALLEGATIONS

Prime is a Colorado limited liability company with its place of business in Colorado

Springs, Colorado. (Pl.'s Compl. ¶ 1.)  Prime's business includes operation of a restaurant located

at 1605 South Tejon Street in Colorado Springs.  (Pl.'s Compl. Introduction; Ex. A 39.)  Acadia is

an Iowa corporation with its principal place of business in Westbrook, Maine, that provides

1

insurance products and services throughout the United States, including in Colorado. (Pl.'s Compl. ¶ 2.) On or about December 27, 2019, Prime purchased business interruption insurance, the Commercial Lines Policy of insurance No. 3156450-23 (the "Policy"), from Acadia. (Pl.'s Compl. ¶ A3; Ex. A 10.) The Policy insured the premises of Prime's restaurant-business, identified as the "Covered Property," for covered risks during the period beginning December 27, 2019 through December 27, 2020. (Ex. A 10, 39.)

I.      The Policy.

The Policy's Commercial Property Coverage Part provided all-risk building coverage, which was limited to $1,868,100. (Ex. A 39.) This coverage insured Prime for "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (Ex. A 94.) According to the Policy, "Covered Cause of Loss" means "direct physical loss unless the loss is excluded or limited in the policy." (Ex. A 124.)

The Policy also includes a "Business Income (And Extra Expense) Coverage Form" (the "Business Income Form"). (Pl.'s Compl. ¶ A10; Ex. A 110.) The Business Income Form provided coverage for lost business income:

> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property . . .
> The loss or damage must be caused by or result from a Covered Cause of Loss.

(Ex. A 110.) It also provided "Extra Expense" coverage for "necessary expenses" incurred by Prime "during the 'period of restoration'" that Prime "would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." (Pl.'s Compl. ¶ A10; Ex. A 110.)

The Policy defines "operations" to mean "business activities occurring at the" Covered Property. (Ex. A 118.) "Suspension" is defined as "[t]he slowdown or cessation of [the insured's]

2

business activities." (Ex. A 118.) The "period of restoration" means the period of time that begins "72 hours after the time of direct physical loss or damage for Business Income Coverage," or "immediately after the time of direct physical loss or damage for Extra Expense Coverage," that was caused by or resulted from any Covered Cause of Loss at the Covered Property. (Ex. A 118.) This period ends on the earlier of "the date when the property . . . should be repaired, rebuilt or replaced with reasonable speed and similar quality" or "the date when business is resumed at a new permanent location." (Ex. A 118.) The "period of restoration" does not include "any increased period required due to the enforcement of or compliance with any ordinance or law that . . . regulates the construction, use or repair . . . of any property" or "[r]equires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants." (Ex. A 118.) A "pollutant" is defined as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Ex. A 118.)

The Policy also provided "Additional Coverages," including coverage for business interruption caused by the exercise of "Civil Authority." (Pl.'s Compl. ¶ A10; Ex. A 111.) This coverage applied when "a Covered Cause of Loss causes damage to property other than [the Covered Property]" and insured against "actual loss of Business Income sustain[ed] and necessary Extra Expenses caused by action of civil authority that prohibits access to" the Covered Property. (Ex. A 111.) The coverage is triggered only when "[a]ccess to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the [Covered Property is] within that area but [is] not more than one mile from the damaged property," and the action of the civil authority "is taken in response to a dangerous physical condition resulting from the damage or continuation of the Covered Cause of Loss that caused the damage." (Ex. A 111.)

3

The Additional Coverages within the Commercial Property Coverage Part are modified by a "Premier Choice Property Enhancement" ("Enhancement"). (Ex. A 49.) The Enhancement adds coverage for "Expediting Expenses" incurred by Prime "as a result of direct physical loss or damage to Covered Property." (Ex. A 51.) "Expediting Expenses" are "reasonable extra costs for temporary repairs of and for expediting the repairs or replacement of Covered Property damaged by a Covered Cause of Loss." (Ex. A 51.)

In addition to its coverages, the Policy also lists numerous exclusions to coverage under the Commercial Property Coverage Part. (Ex. A 124-29.) According to the Policy, Acadia is not liable to pay "for loss or damage caused directly or indirectly" by an excluded cause of loss, and such loss or damage "is excluded [from coverage] regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Ex. A 124.)

The "Ordinance or Law" exclusion excludes from coverage loss or damage resulting from "the enforcement of or compliance with any ordinance or law" that regulates "the . . . use or repair of any property." (Ex. A 124.) This exclusion applies to a loss that results from either an ordinance or law "that is enforced even if the [Covered Property] has not been damaged" or when increased costs of compliance are incurred by the insured in the course of "construction, repair, renovation, remodelling or demolition of [the Covered Property] . . . following a physical loss" to it." (Ex. A 124.)

The Enhancement adds "Ordinance or Law" coverage that is not subject to the "Ordinance or Law" exclusion. (Ex. A 53, 63.) Nevertheless, that additional coverage is triggered only when the ordinance or law in question "requires compliance as a condition precedent to obtaining a building permit or certificate of occupancy." (Ex. A 53.) Further, the Enhancement clarifies that Acadia will not pay for "[t]he enforcement of or compliance with any ordinance or law which

4

requires . . . remediation of property due to contamination by 'pollutants,'" or for "[a]ny costs associated with the enforcement of or compliance with any ordinance or law which requires any insured . . . to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of 'pollutants.'"  (Ex. A 53-54.)

Similar to the "Ordinance or Law" exclusion, the Policy also excludes from coverage "loss or damage caused by or resulting from . . . Acts or decisions . . . of any person, group, organization or government body."  (Ex. A 127.)  However, notwithstanding this exclusion, coverage extends to loss or damage caused by a Covered Cause of Loss (again, "direct physical loss" within the meaning of the Policy) that results from the excluded risk for "Acts or Decisions."  (Ex. A 127.) Another exclusion contained within the Policy excludes from coverage "loss or damage caused by or resulting from . . . Delay, loss of use or loss of market."  (Ex. A 126.)

Finally, the Policy provides "Special Exclusions" applicable only to the Business Income Form.  (Ex. A 128.)  Among these Special Exclusions, the Policy excludes from coverage any "consequential loss" not enumerated within the Policy. (Ex. A 128.)

II.      The COVID-19 Pandemic and Regulation by the State of Colorado.

The novel coronavirus, SARS-CoV-2, that causes COVID-19, was first identified by investigators during December 2019.  (Ex. B 1.)  COVID-19 is a "severe infectious disease" that can lead to illness and death.  (Pl.'s Compl. ¶ B16.)  It is highly contagious and uniquely resilient, capable of remaining infectious beyond periods generally considered possible; it can survive on a variety of common surfaces for up to twenty-eight days at room temperature.  (Pl.'s Compl. ¶¶ B20-B21.)  According to the World Health Organization ("WHO"):

> The disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks. People can catch COVID-19 if they breathe in these droplets from a person infected with the virus. These droplets can land on objects and

surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth.

(Pl.'s Compl. ¶ B24.) This means that the coronavirus is spread among people through respiratory, airborne and surface transmission. (Pl.'s Compl. ¶¶ C33-C34, C38; Ex. B 1.)

A physical object or material that carries and is capable of transmitting infectious agents like the coronavirus, and that is thusly altered to become a vector of disease, is known as a "fomite." (Pl.'s Compl. ¶ C38.) The presence of the coronavirus can transform everyday surfaces and objects into fomites. (Pl.'s Compl. ¶ C42.) Because contraction of COVID-19 is dangerous and potentially fatal, the coronavirus's presence in and on property, including in indoor air, on surfaces and objects, renders the property lost, unsafe and unfit for its normal use. (Pl.'s Compl. ¶¶ C45-C46.) To abate the spread of the coronavirus and COVID-19, consumer-facing businesses like restaurants observe social-distancing, encourage or require masking for employees and customers, and routinely clean surfaces to disinfect them. (Pl.'s Compl. ¶¶ F81-F83.)

To slow the spread of COVID-19, beginning in March 2020 executive officials throughout the United States issued civil orders and advisements recognizing the emergent "disaster emergency" threatening public health. (Pl.'s Compl. ¶ E64.) Among them, Governor Jared Polis of the State of Colorado issued an executive order recognizing a disaster emergency in Colorado caused by the spread of COVID-19. (Pl.'s Compl. ¶¶ E71, E73; Ex. B 1.) That order was followed by a "Stay At Home Order" issued by Governor Polis on March 25, 2020. (Pl.'s Compl. ¶ E74; Ex. C 1.) The "Stay At Home Order" directed any non-"Critical Business" to close temporarily, except as necessary to engage in minimum basic operations needed to protect assets or maintain personnel functions. (Ex. C 2.)

During this time, the Colorado Department of Public Health and Environment (the "CDPHE") issued Public Health Order 20-22. (Ex. I.) This Order instructed all restaurants in the

State of Colorado to close temporarily to slow the spread of COVID-19. (Ex. I ¶ 6.) The Order categorically grouped restaurants with other public accommodations that offer food or beverage for on-premises consumption. (Ex. I § II(A).) Such places were "encouraged to offer food and beverage using delivery service, window service, walk-up service, drive-through service, or drive-up service." (Ex. I § II(A).) They were prohibited from offering or permitting consumption of food and beverage onsite. (Ex. I § II(A).) Places of public accommodation like restaurants are not "Critical Businesses" according to CDPHE. (Ex. H § III(C).)

The Governor's initial Stay At Home Order, applicable to all Coloradans, was extended during the beginning of April 2020. (Ex. D.) On April 26, 2020, Governor Polis issued the "Safer At Home Order," ordering CDPHE to issue a new public health order lifting the Stay At Home Order. (Ex. E 3.) Governor Polis indicated that, beginning May 1, 2020, customers would be permitted to return to public accommodations' business premises in a manner allowing for compliance with social distancing requirements. (Ex. E 4.) By May 4, 2020, "Non-Critical Commercial Businesses" were permitted to allow up to fifty percent of their employees to return to the business's premises to conduct in-person work. (Ex. E 4.)

Governor Polis extended Colorado's state of disaster emergency by executive order on May 22, 2020. (Pl.'s Compl. ¶ E76; Ex. F 2.) The Safer At Home Order was extended on June 1, 2020, and it persisted through Summer 2020. (Pl.'s Compl. ¶ E77; Ex. G 1-2.)

III.     Presence of COVID-19 at the Covered Property.

Employees, customers, and other business visitors who were infected with, carrying, or exposed to persons infected with COVID-19 were physically present at the Covered Property on various dates during 2020 and 2021. (Pl.'s Compl. ¶¶ F86-F91.) Those individuals caused COVID-19 to proliferate through aerosols and droplets they spread throughout the Covered

Property. (Pl.'s Compl. ¶¶ F86, F92.) Those aerosols and droplets lingered in the air and came into contact with and adhered to the surfaces of Prime's real property and personal property. (Pl.'s Compl. ¶¶ F89, F92.) This imbued real and personal property located at the Covered Property with a capacity to transmit COVID-19 to others, and it rendered the Covered Property dangerous and unusable. (Pl.'s Compl. ¶¶ F86-F93.)

The presence of COVID-19 in the air and on surfaces caused the Covered Property to become "altered, damaged, and [] unsafe." (Pl.'s Compl. ¶ F95.) This necessitated repairs and remediation. (Pl.'s Compl. ¶¶ F95-F97.) To cleanse the air at the Covered Property and prevent further contamination of real and personal property kept there, Prime took remedial measures including, but not limited to, installation of new air filters. (Pl.'s Compl. ¶ F96.) Prime undertook these measures so that it could continue its business and avoid further property damage. (Pl.'s Compl. ¶ F97.)

Due to the coronavirus's physical presence within Prime's community, the Covered Property is subject to constant recontamination notwithstanding Prime's efforts to practice social distancing and face-covering, and to perform routine disinfectant cleaning. (Pl.'s Compl. ¶¶ F83, F97.) The physical presence of COVID-19 forced Prime to substantially reduce or shut down its business, causing it to operate below its ordinary level of operation and incur reduced income. (Pl.'s Compl. ¶ F84.) This constituted a "loss of functionality" of the Covered Property. (Pl.'s Compl. ¶ F89.) Furthermore, Prime's restaurant located at the Covered Property was forced to suspend its operations temporarily as a result of the closure orders issued by Governor Polis for the State of Colorado. (Pl.'s Compl. ¶ F99.)

Due to the presence of COVID-19 at the Covered Property and the aforementioned closure orders, Prime lost business income and incurred extra expenses. (Pl.'s Compl. ¶ F100.)

8

Accordingly, it submitted a claim for loss to Acadia under the Policy. (Pl.'s Compl. ¶ F101.) Acadia denied Prime's claim, (Pl.'s Compl. ¶ F101), and Prime responded by filing its complaint.

LEGAL STANDARD

The parties agree that the substantive law of the State of Colorado should govern Prime's claims. (Mot. Dismiss 6; Pl.'s Opp'n to Def.'s Mot. Dismiss n.1.) Otherwise, this Court applies the rules of procedure provided by the Maine Supreme Judicial Court, as interpreted by the Law Court.

I.      Standard of Review.

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint and does not probe the merits of the underlying case." *Carey v. Bd. of Overseers of the Bar*, 2018 ME 119, ¶ 19, 192 A.3d 589 (internal quotation marks omitted). To survive a motion to dismiss for failure to state a claim, the complaint "must allege facts with sufficient particularity so that, if true, they give rise to a cause of action; merely reciting the elements of a claim is not enough." *Meridian Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 2, 250 A.3d 122 (citation omitted). This standard requires only that the complainant "give fair notice of the cause of action by providing a short and plain statement of the claim" showing their entitlement to relief. *Id.* ¶ 3 (citation omitted).

In reviewing a motion to dismiss, courts must "consider the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem. Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The complaint is viewed "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830). Thus, "a complaint is sufficient unless it appears to a certainty the plaintiff is entitled to no relief under any set of facts [it] might prove in support of [its] claim." *Richards v. Soucy*, 610 A.2d 268, 270 (Me. 1992).

9

Generally, a court may consider only the pleadings on a motion to dismiss. *Est. of Robbins v. Chebeague & Cumberland Land Tr.*, 2017 ME 17, ¶ 2 n.2, 154 A.3d 1185 (citing *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶¶ 8-9, 843 A.2d 43). However, official public documents, documents central to the plaintiff's complaint, and documents referred to therein may also be considered in a ruling on a motion to dismiss "without converting [the] motion . . . into a motion for summary judgment when the authenticity of such documents is not challenged." *Id.* (citing *Moody*, 2004 ME 20, ¶ 10, 843 A.2d 43).

II.     Construction and Interpretation of Policies of Insurance.

The interpretation of an insurance policy is a matter of law. *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). As contracts, insurance policies should be interpreted consistently with well-settled principles of contractual interpretation. *Id.* (citing *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990)). This means that courts must construe terms of a policy to promote the intent of the parties. *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005). This also means that words of the contract should be given their plain meaning according to common usage, and that strained constructions should be avoided. *Huizar*, 52 P.3d at 819 (citation omitted).

"A mere disagreement between the parties concerning interpretation of the policy does not create an ambiguity." *Cary*, 108 P.3d at 290. Thus, to determine whether a policy contains an ambiguity, courts must evaluate the policy as a whole. *Id.* An insurance policy, or a provision contained therein, is ambiguous when it is reasonably susceptible to more than one meaning. *State Farm Mut. Aut. Ins. Co. v. Stein*, 924 P.2d 1154, 1158 (Colo. App. 1996). Courts will not force an ambiguity in order to resolve a claim against the insurer. *Martinez v. Hawkeye-Security Ins. Co.*, 576 P.2d 1017, 1019 (Colo. 1978) (citation omitted). If the policy's provisions are clear and

10

unambiguous, courts should not rewrite them and instead must give effect to their plain and ordinary meaning. *Emenyonu v. State Farm Fire and Cas. Co.*, 885 P.2d 320, 323 (Colo. App. 1994). However, ambiguous or inconsistent language in an insurance policy must be construed against the insurer in favor of coverage. *Dupre v. Allstate Ins. Co.*, 62 P.3d 1024, 1027-28 (Colo. App. 2002).

DISCUSSION

As a result of the presence and prevalence of COVID-19 and the corresponding closure and stay at home orders issued by the State of Colorado, Prime claims it suffered direct physical loss and damage to the Covered Property and that it experienced lost or limited functionality thereof. (Pl.'s Compl. ¶ F80.) In its Complaint, Prime seeks 1) declaratory relief (Count I), along with damages for breach of contract related to Acadia's denial of coverage for alleged 2) property loss and damage (Count II), 3) business interruption (Count III), as well as 4) Acadia's denial of additional coverages from the Policy's "Extensions" and "Extensions of Time Element Coverage" (Count IV), and for 5) Acadia's purported violation of the Maine Insurance Code at 24-A M.R.S.A. § 2436-A,[1] which provides a cause of action for unfair claims settlement practices by insurance companies (Count V).

In response, Acadia seeks dismissal of Prime's complaint. Acadia asserts that 1) the Policy's Building, Business Income, and Extra Expenses coverages apply only where there is a "direct physical loss of or damage to" the insured property, but not where there is only purely economic loss; 2) Prime cannot establish the elements required to trigger Civil Authority coverage, namely "damage to nearby property, and an action of civil authority that 'prohibits access' to the

---

[1] Prime's Complaint refers to "24-A M.R.S. § 2136," (Pl.'s Compl. Count IV ¶¶ 144-155), but there is no such statute. The Court assumes Prime intends to make its claim, in part, under 24-A M.R.S.A. § 2436-A "Unfair claims settlement practices." 24-A M.R.S.A. § 2436-A (2015).

11

insured property"; and 3) the Policy's exclusions bar coverage for Prime's loss of use claims. (Mot. Dismiss 2.)

I.      Prime adequately alleges "direct physical loss or damage" within the meaning of the Policy.

Under the Policy, the Building, Business Income and Extra Expenses, and Civil Authority coverages apply only when there is "direct physical loss or damage" to the Covered Property. (Ex. A. 110, 124.) The Policy does not define the phrase "direct physical loss," and the parties dispute its meaning and consequently the validity of Prime's claims. Nevertheless, Acadia argues strenuously that a majority of courts nationwide have rejected similar claims, and this Court should follow the majority approach. The problem with Acadia's argument based on the weight of authority, however, is that Colorado's leading case, *Western Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52 (Colo. 1968), appears to leave the door ajar for this claim to slip in past the Motion to Dismiss. Recognizing the challenge presented by *Western Fire*, Acadia argues this Court should narrowly interpret *Western Fire* and Colorado law as does the U.S. District Court in *Tom's Urban Master LLC v. Fed. Ins. Co.*, 2022 U.S. Dist. LEXIS 60293 (D. Colo. Mar. 31, 2022). However, the Court finds the broader reading of *Western Fire* and Colorado law presented by the court in *Spectrum Ret. Comtys., LLC, et al. v. Cont'l Cas. Co.*, No. 2021-CV-30695, slip op. at 7-10 (Colo. Dist. Ct. July 13, 2022) to be more faithful to Colorado's motion to dismiss standard and, overall, substantially persuasive in its approach.

As explained at length by the *Spectrum* court, under Colorado law "direct physical loss or damage" to property occurs when the loss of use is the consequence of an occurrence affecting the property that renders it "uninhabitable" and makes further use of it "unduly dangerous." *Spectrum*, slip op. at 7, 9 (Colo. Dist. Ct. July 18, 2022) (collecting cases); *see Western Fire Ins. Co.*, 437 P.2d at 55. Finding "direct physical loss or damage" as that term is used in an all-risk commercial

12

property insurance policy "does not require evidence of 'tangible injury' or 'physical alteration' of property." *Spectrum*, slip op. at 9 (Colo. Dist. Ct. July 18, 2022) (citing *Western Fire Ins. Co.*, 437 P.2d at 56). Accordingly, at this stage of the litigation it is enough that Prime alleges 1) the coronavirus was actually present on or attached to surfaces on the Covered Property, and 2) its presence caused the Covered Property to become uninhabitable, unusable, inaccessible, or unduly dangerous to use. *See id.* Likewise, Prime adequately pleads a direct connection between the alleged "direct physical loss or damage" it endured, local government COVID-19 shutdown orders, and the resulting limited use of the Covered Property. *See id.* at 13. Accordingly, Acadia's motion is DENIED with respect to Counts I-IV of Prime's Complaint.

II.  <u>Prime does not adequately plead a violation of Maine Insurance Code 24-A M.R.S.A. § 2436 or any claim for bad-faith settlement by Acadia.</u>

After citing the Maine Insurance Code, 24-A M.R.S.A. § 2436-A as one basis for its cause of action, Prime subsequently agreed with Acadia that this case should be governed by the substantive law of the State of Colorado. Thus, the Maine statute governing unfair claim settlement practices does not apply. Moreover, Prime makes no claim under the State of Colorado's analogue to Maine's § 2436-A, located at Colo. Rev. Stat. § 10-3-1115 (2017). Dismissal is warranted as to Count V for this reason.

Even if § 2436-A were applicable, a civil cause of action accrues under § 2436-A(E) when the insurer "[w]ithout just cause, fail[s] to effectuate prompt, fair and equitable settlement of claims submitted in which liability has become reasonably clear." 24-A M.R.S.A. § 2436-A(1)(E) (2015). The insurer acts "without just cause" when "it refuses to settle claims without a reasonable basis." *Id.* § 2436-A(2). In its response in opposition to Acadia's Motion to Dismiss, Prime argues that a "plain reading" of the Policy's definitions of "damage" and "property damage" "at the very least [] creates an ambiguity." (Pl.'s Opp'n to Def.'s Mot. Dismiss 2.) By qualifying the Policy's

language as ambiguous, Prime implicitly concedes Acadia's interpretations of "damage" and "property damage" were within the universe of interpretations to which those terms are reasonably susceptible, and that its denial of coverage therefore rested on a reasonable basis within the meaning of the statute. *See Sch. Union No. 37 v. United Nat'l Ins. Co.*, 617 F.3d 554, 564 (1st Cir. 2010) (holding insurer had a reasonable basis to deny coverage when Maine law regarding the interpretation of the term "damages" was uncertain, thereby providing the insurer with legitimate and reasonable doubts as to the scope of its liability). Thus, Acadia's motion is GRANTED as regards Count V of Prime's Complaint.

CONCLUSION

Prime adequately pleads entitlement to the Policy's business interruption and civil authority coverages. However, Prime failed to sufficiently allege its bad faith claim. Accordingly, Acadia's Motion to Dismiss is DENIED as to Counts I-IV of the Complaint, but the Motion to Dismiss is GRANTED as to Count V.

The Clerk is instructed to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

So Ordered.

Dated: **11/02/2022**

Michael A. Duddy, Judge
Business and Consumer Court

Entered on the docket: 11/02/2022

14

BCD-CIV-2022-00023


PRIME HOSPITALITY, LLC.

    *Plaintiff(s)*

*v.*

ACADIA INSURANCE COMPANY

    *Defendant(s)*


<u>Party Name:</u>                   <u>Attorney Name:</u>

<u>*Plaintiff:*</u>

  *Prime Hospitality*              Michael Earner, Esq.
                                **Earner & Weaver, PLLC**
                                10 Woodbridge Road, unit 731
                                York, ME 03909


<u>*Defendant*</u>:

  *Acadia Insurance Co.*            James Bowie, Esq
                                **Thompson Bowie & Hatch, LLC**
                                Po Box 4630
                                415  Congress St 5th Floor
                                Portland, Me 04112